307 S.W.3d 556 (2010)
In the Interest of D.A., a Child.
No. 05-09-00410-CV.
Court of Appeals of Texas, Dallas.
March 10, 2010.
Rehearing Overruled April 7, 2010.
*557 Michael Mowla, Attorney at Law, Duncanville, TX, for Appellant.
Joy David, Dallas, TX, for Appellee.
*558 Before Justices O'NEILL, LANG, and MYERS.

OPINION
Opinion By Justice MYERS.
Clifton Deadmon appeals the trial court's judgment appointing him possessory conservator and Joy David sole managing conservator of their son, David Atam. In three issues, Father contends the evidence is legally and factually insufficient to support (1) the jury's verdict on the parents' conservatorship; (2) the restrictions on Father's access to the child until he successfully completes an anger-management class; and (3) the trial court's findings and judgment that the child's surname is "Atam." We affirm the trial court's judgment.

BACKGROUND
Father and Mother met while working for the same employer, they became friends, and their relationship resulted in the conception of the child. Father filed a petition to establish the parent-child relationship between him and the child of "Unknown Name." His amended petition identified the child as "David Nwokocha," and Father attached the results of DNA testing showing the probability that he was the father was greater than 99.999 percent. In the amended petition, Father requested that the child's surname be changed to "Deadmon." Mother filed a counterpetition identifying the child as "David Nwokocha Atan" [sic], requesting that she be appointed sole managing conservator, alleging Father "has a history or pattern of committing family violence during the two-year period preceding the date of filing of this suit," and requesting the court either deny Father access to the child or issue orders for the child's protection.
On December 8, 2008, the trial court issued temporary orders that identified the child as "David Atam" and appointed both parents temporary joint managing conservators. The temporary orders restricted the child's residence to Dallas County until further order of the court, prohibited Mother from removing the child from the country, and ordered Mother to surrender any passport issued to her or the child. The orders stated Father would have possession of the child for one hour on Tuesday and Thursday evenings and from 9 a.m. to 5 p.m. every other Saturday, with the exchanges to take place at a McDonald's restaurant. The orders stated, "It has been represented to the Court that there has been no pattern of child neglect or family violence by any party to this case within two years preceding the filing of this case or during the pendency of this case."
On December 22, 2008, Father's counsel filed a demand for a jury trial and paid the fee. That same day, Father's counsel filed a motion to withdraw as Father's attorney alleging he was unable to communicate effectively with Father and that Father had "on many occasions" refused his advice and interpretation of the law.
On February 17, 2009, when the child was a year old, the trial court conducted a jury trial on the issue of the conservatorship of the child. Father appeared pro se. When the venire was seated, the trial court asked Father if he wanted to ask the prospective jurors any questions, and he declined. Mother's counsel then questioned the venire. When she finished, the trial court gave Father another opportunity to question the panel, but he told the court he would not participate in the trial. He stated that Mother was a terrorist, and he would not be a part of the proceeding. When the court asked Father if he had any peremptory challenges, he refused to *559 answer. Father also refused to answer when the court tried to swear him in as a witness before the beginning of testimony. When the time came for Father to present his case in chief, he refused to speak. Mother's counsel moved for a directed verdict, which the trial court denied, stating some evidence needed to be presented for the jury. Mother's counsel then presented Mother's case in chief.
Mother testified she was originally from Nigeria and that she had three other children. It appears from her testimony that she came to the United States in 1999 with her oldest children under a United Nations' program as a war refugee. She met Father at the restaurant where they both worked. She testified they became friends and had a relationship but later broke up. The child was conceived when she was involved with another man. She testified she was unaware Father was the father until the DNA results proved his paternity. Since learning Father was the father, she has tried to cooperate with him about parental issues, but her testimony demonstrated that Father's animosity toward her has made their relationship as parents of the child difficult.
She testified that exchanges of custody took place at a McDonald's restaurant because when they met at her house, Father would verbally abuse, insult, and humiliate her in front of all of her children. With the exchanges at McDonald's, Father still verbally abused her. She testified:
Every visit is almost an insult. I'm insulted. There are some things I cannot say, but I'm a terror and he hate me, he despise me so much, he will do anything possible to make my life miserable. It'sthe baby will be crying, people will be looking at me, he would humiliate me in front of people.
The police often were called to the exchanges of the child. When Mother would pick up the child after the visitation with Father, the child was "intense like something is wrong, fussing and yelling." Once, when she took the child to the hospital because he had a high fever, Father met her there, and she described how Father verbally berated and humiliated her:
The baby has his thumb in his mouth and I was rocking him. He started yanking the baby hands from the baby mouth and told me that I should that this is American citizen and that if anything happens to the baby that I'm responsible of it and I'm so stupid, calling me names and saying all kind of awful things and made a statement that since I'm not an American, because the baby is in America, he will do anything to take the baby from me and then will ship me back to Africa. If Iif I'm not dead, they will ship me back for life, and he would be the one to purchase the first ticket to take me there. . . . He started going on and being loud, making statement, people looking at me like I waslike I stole the child or something.
She testified Father refused to discuss the child's medical expenses with her and refused to provide medical insurance for the child. She stated Father repeatedly called her a terrorist and told her she was a criminal because she came from a different country.
Mother testified that Father brought his sixteen-year-old daughter to one of the visits, and she described what occurred:
One time, he brought his daughter and she walkedshe was, like, "Are you the mother of my brother?" And I said, yes. And she looked into my eye and said that, "I hope your are strong enough because dad is evil. My dad did all of this stuff to my mom, trying to take me away from my mom." And she looked at me and say that to me, a 16-years-old girl, it hurt. Right from that *560 day, then he yell at her, and right from that day, that girl has not been coming to visit and I don't know.
Mother also described how Father had demanded that she should give him the child "and just walk away."
Mother also described an incident at her apartment complex where she was walking through the parking lot with the child when Father, who was in his vehicle, drove toward her as if he was going to run over her and the child. A woman who was walking with Mother jumped out of the way of the vehicle. Mother testified she was frightened of Father.
Mother testified she believed it was in the child's best interest that she be appointed sole managing conservator. She asked that Father be required to attend anger-management classes and that Father's visitation be supervised.
When Mother's counsel "passed the witness," the trial court asked Father if he had any questions for Mother, but he did not respond. Mother's counsel then called Father as a witness. Father refused to answer any questions from Mother's counsel, stating Mother had told lies. Father and the trial court then had a lengthy discussion about Father's right to a jury trial, the fact that he requested one, his lack of a right to appointed counsel, and his inability to afford an attorney because of his child-support obligations. In the findings of fact and conclusions of law, the trial court described Father's manner in these discussions as shouting "aggressively and angrily to the court." The trial court told Father this was his opportunity to make a statement and testify on his own behalf, but Father did not respond. When Father remained silent on the stand, the court asked him to step down. The court asked the parties if they closed the evidence: Mother's attorney answered she rested and closed, and Father did not answer.
The court then read the charge to the jury and sent them to deliberate.[1] Question 1 of the charge asked the jurors, "Who should be appointed managing conservator of the child?"[2] The instruction with the question advised the jurors that they could name one person as sole managing conservator or they could indicate that both parents should be appointed joint managing conservators. The charge also instructed the jurors that if they named a sole managing conservator in Question 1, then they should not answer the other questions, which concerned the right to designate the child's residence and geographic restrictions on the child's residence. The jury returned a unanimous verdict appointing Mother sole managing conservator of the child.
Two weeks after the trial, the court issued its final judgment. In accordance with the jury's verdict, the judgment appointed Mother sole managing conservator and Father possessory conservator of the child. The judgment set out the times for Father's possession of the child but provided his right of possession was suspended until he successfully completed an anger-management course. The judgment also states, "The parties have agreed not to limit the residency of the child to Dallas or any other county." The judgment does not contain an order concerning the child's name.

*561 CONSERVATORSHIP
In his first issue, Father asserts the evidence is legally and factually insufficient to support the jury's verdict appointing Mother sole managing conservator. The family code authorizes jury trials in all suits affecting the parent-child relationship except a suit in which adoption is sought and a suit to adjudicate parentage. TEX. FAM.CODE ANN. § 105.002 (Vernon Supp. 2009). A party is entitled to a jury trial on the issue of the appointment of a managing conservator, and the trial court may not contravene the jury's verdict. Id.; Alexander v. Rogers, 247 S.W.3d 757, 761 (Tex. App.-Dallas 2008, no pet.). However, the jury's findings underlying a conservatorship decision are subject to ordinary legal and factual sufficiency review. Lenz v. Lenz, 79 S.W.3d 10, 17 (Tex.2002); Alexander, 247 S.W.3d at 761.
In a legal sufficiency review, we view all the evidence in a light favorable to the finding, crediting favorable evidence if a reasonable fact finder could, and disregarding contrary evidence unless a reasonable fact finder could not. City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex.2005). A challenge to the legal sufficiency of evidence will be sustained when the evidence offered to establish a vital fact does not exceed a scintilla; that is, when the evidence is "so weak as to do no more than create a mere surmise or suspicion." Kroger Tex. Ltd. P'ship v. Suberu, 216 S.W.3d 788, 793 (Tex.2006) (quoting Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983)). When reviewing the factual sufficiency of evidence, we examine all the evidence and set aside a finding only if it is so contrary to the evidence as to be clearly wrong and unjust. Cameron v. Cameron, 158 S.W.3d 680, 683 (Tex.App.-Dallas 2005, pet. denied). In conducting our review of both the legal and factual sufficiency of the evidence, we are mindful that the jury, as fact finder, was the sole judge of the credibility of the witnesses and the weight to be given their testimony. City of Keller, 168 S.W.3d at 819; Hinkle v. Hinkle, 223 S.W.3d 773, 782 (Tex.App.-Dallas 2007, no pet.). We may not substitute our judgment for the fact finder's, even if we would reach a different answer on the evidence. See Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 407 (Tex.1998); Hinkle, 223 S.W.3d at 782.
The family code states, "It is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child." TEX. FAM.CODE ANN. § 153.131(b) (Vernon 2008). Mother's testimony shows Father verbally abused and humiliated her whenever they met and in front of anyone in the area, including the child and Mother's other children; Father refused to cooperate with her in making parental decisions; on one occasion, Father appeared to try to run over her and the child with a car; and the child was upset when returned to Mother after the visits with Father. Aside from his statement that Mother had told lies, Father presented no evidence controverting Mother's testimony. After reviewing the entire record, we conclude the evidence is legally and factually sufficient to support the jury's verdict that appointing Mother sole managing conservator was in the child's best interest. We overrule Father's first issue.

RESTRICTIONS ON POSSESSION AND RESIDENCE
In the second issue, Father contends the trial court erred in determining that Father should be denied access to the child until he completes an anger-management course, the residence of the child should not be restricted to Dallas County or its contiguous counties, and that Mother should not be prohibited from removing the child from the United States.

*562 Restrictions on Possession
The trial court ordered that until the child was three years old, Father's possession of the child would be limited to one hour on Tuesday and Thursday evenings and from 9 a.m. to 5 p.m. every other Saturday, and that Father's possession would be pursuant to the standard possession order after the child turned three years old. The order also provided that Father's right to possession of the child was suspended until he successfully completed an anger-management course.
The family code prescribes a "standard possession order" that is presumed to be in the child's best interest and to provide the reasonable minimum possession. TEX. FAM.CODE ANN. § 153.252 (Vernon 2008); see id. §§ 153.311-.317 (Vernon 2008 & Supp.2009) (standard possession order). That presumption is rebuttable. Id. § 153.252(a). Besides the standard possession order, the family code requires the court to "render an order appropriate under the circumstances for possession of a child less than three years old." Id. § 153.254. The trial court may depart from the standard possession order as required by the circumstances of the conservators, the best interest of the child, and "any other relevant factor." Id. §§ 153.253,.256. We review a trial court's variance from the standard possession order for an abuse of discretion. In re T.J.S., 71 S.W.3d 452, 458 (Tex.App.-Waco 2002, pet. denied). A trial court abuses its discretion when it acts without reference to any guiding rules or principles, which occurs when the court's act is arbitrary or unreasonable. Worford v. Stamper, 801 S.W.2d 108, 109 (Tex.1990).
The trial court stated in its findings of fact and conclusions of law that the court varied from the standard possession order because (a) Father refused to participate in the trial even though requested to do so by the court; (b) "[t]hroughout the entire trial proceedings, [Father] did not speak except to shout out aggressively and angrily to the court"; and (c) the evidence showed Father threatened Mother and he failed to present any evidence that his actions were justified.
Father argues the findings show the court limited his access to the child because the court was annoyed with Father's refusal to participate in the trial. Father asserts the trial court abused its discretion by denying him access to the child until he completed an anger-management course. Citing to his affidavit in support of his motion for new trial, Father asserts he was upset at the trial because he was not informed he would be proceeding to a jury trial and would have to represent himself on February 17, 2009, he requested additional time to hire an attorney, and the court denied this request. However, the record of the trial shows Father stated (or shouted, as the trial court found) that he knew the trial was on February 17, 2009 but thought it was at 1:30 p.m. and that he could not afford an attorney because of his child-support obligations. The record of the trial does not show Father requested additional time to find an attorney. At the hearing on the motion for new trial, the court stated, "I find that the movant's affidavit is in direct contravention to the facts of what happened. He demanded a jury trial, and he was told when the trial would be. He showed up for the trial, and he refused to speak."
The evidence supports the trial court's requirement that Father complete an anger-management course. Mother's testimony showed Father was quick to anger, shouting vile abuse at Mother and his sixteen-year-old daughter. That he could not manage his anger was shown by his shouting abuse at Mother in front of the child and her other children, in restaurants, *563 parking lots, and even in hospitals. Father's anger became a threat to the physical safety and well being of the child when Father drove recklessly toward Mother and the child, causing another person walking next to Mother to jump out of the way. Mother's testimony about Father's uncontrollable anger was corroborated by Father's in-court behavior, shouting at the judge in front of the jury. Mother's testimony and Father's behavior supported the trial court's decision to restrict Father's access to the child.
After considering the entire record, we conclude the trial court did not abuse its discretion by varying from the standard possession order and requiring Father to complete an anger-management course before having access to the child.

Lack of Residence and Travel Restrictions
Father asserts the trial court erred in finding that the child's residence should not be restricted to Dallas County and its contiguous counties and that Mother should not be prohibited from removing the child from the United States.
Concerning the lack of geographical restrictions on the child's residence, the final judgment states, "The parties have agreed not to limit the residency of the child to Dallas or any other county." Under the presumption of regularity of judgments, we presume recitations in the final judgment are correct absent any evidence to the contrary. See S. Ins. Co. v. Brewster, 249 S.W.3d 6, 12-14 (Tex.App.-Houston [1st Dist.] 2007, pet. denied); In re E.V., 225 S.W.3d 231, 234 (Tex.App.-El Paso 2006, pet. denied). Father's motion for new trial asserts, "Movant did not agree, as the final Order presents, that the residency of the child should not be limited to Dallas or contiguous counties." However, Father's affidavit in support of the motion for new trial does not deny or even mention the agreement not to restrict the child's residence. At the hearing on the motion for new trial, Father asked the court to rule on the motion based on the affidavit without any additional testimony. Because the affidavit did not deny the agreement not to restrict the child's residence, Father presented no evidence controverting the judgment's statement that the parties had agreed not to limit the child's residence. Accordingly, we must presume the statement was correct.
As for the lack of a prohibition on Mother leaving the country with the child, the record does not show Father requested such a prohibition or that he objected to the lack of a prohibition. Before a party may present a complaint on appeal, the record must show the party made a timely request, objection, or motion to the trial court stating the grounds for the ruling the party sought. TEX.R.APP. P. 33.1(a)(1)(A). Because the record does not show Father made a request or motion that the court prohibit Mother from leaving the country with the child, or an objection to the lack of the prohibition, Father has not preserved for appellate review any error from the absence of the prohibition. See id.
We overrule Father's second issue.

THE CHILD'S NAME
In his third issue, Father contends trial court erred by stating in the judgment and findings of fact and conclusions of law that the child's name is "David Atam." In his amended petition, Father alleged, "Good cause exists to change the name of the child known as David Nwokocha, and Petitioner requests that the child's name be changed to David Deadmon." Mother's counterpetition did not request the child's name be changed. The final judgment and *564 the court's findings of fact and conclusions of law identify the child as "David Atam." On appeal, Father asks that we enter judgment changing the child's name to "David Deadmon" or that we remand the issue to the trial court for further proceedings.
The trial court may order the name of a child changed if change is in the best interest of the child. TEX. FAM.CODE ANN. § 45.004(a) (Vernon Supp.2009). It is in the court's discretion whether to grant a request to change a child's name. See Newman v. King, 433 S.W.2d 420, 424 (Tex.1968); In re Guthrie, 45 S.W.3d 719, 723 (Tex.App.-Dallas 2001, pet. denied).
A father has no constitutional right to have his children bear his last name. Newman, 433 S.W.2d at 422-23; In re Guthrie, 45 S.W.3d at 723. Although the family code provides that a court may order a child's name changed, the general rule is that courts exercise that power reluctantly and only when the substantial welfare of the child requires it. Newman, 433 S.W.2d at 423; In re Guthrie, 45 S.W.3d at 723. A parent's interest and desire in changing the child's name is only a secondary consideration. In re Guthrie, 45 S.W.3d at 723.
During the trial, Mother testified that "Atam" was the name of her ex-husband and that her other children had the surname "Atam." She stated Father told her he did not want the child named "Atam." She testified she did not want the child named "Deadmon" because Father told her "Deadmon means a slave name." She stated she wanted the child named "David Kingsley David" and that Father told her he would agree to that name if she would accept him not going to anger-management class. However, Mother testified she wanted the court to order Father to take an anger-management course. Father presented no evidence on the issue of the child's name.
The trial court could conclude from this evidence that the substantial welfare of the child did not require changing the child's name. We conclude Father has not shown the trial court abused its discretion by failing to change the child's name. We overrule Father's third issue.

CONCLUSION
We affirm the trial court's judgment.
NOTES
[1] The trial court did not ask either side if they wished to argue to the jury. However, neither side objected to the submission of the case to the jury without argument.
[2] The jury charge is not in the clerk's record; however, the reporter's record contains the court's reading of the charge to the jury.