**Opinion issued September 11, 2014**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-12-00872-CV

———————————

**JERRY L. BERWICK, Appellant**

**V.**

**RICHARD T. WAGNER, Appellee**

---

**On Appeal from the 309th District Court**
**Harris County, Texas**
**Trial Court Case No. 2008-49782**

---

## O P I N I O N

Appellant Jerry Berwick appeals the trial court's judgment appointing appellee Richard Wagner as sole managing conservator and Berwick as possessory conservator of their minor child, C.B.W. We affirm.

## PRIOR APPEAL

This is the second appeal to this Court arising from the underlying dispute.[1] Berwick and Wagner, both men, were in a relationship with each other from 1994 through 2008. *Berwick v. Wagner*, 336 S.W.3d 805, 807 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) ("*Berwick I*"). They were legally married in Canada in 2003 and registered as domestic partners in California in 2005. *Id*. They lived together in Houston beginning in 1997. *Id*.

In 2005, they entered into a gestational surrogacy agreement with a married woman in California for her to carry a child for them. *Id*. She was implanted with embryos formed from Berwick's sperm and donated ova, which resulted in pregnancy and the birth of a son, C.B.W. *Id*. at 807–08. A California court entered an order entitled "Judgment of Paternity" before C.B.W.'s birth, (1) declaring both Berwick and Wagner each to be a "legal parent" of C.B.W., (2) declaring the surrogate and her husband to not be C.B.W.'s legal parents, (3) ordering the hospital to list Berwick in the space provided for father on the original birth certificate, and (4) ordering the hospital to list Wagner in the space provided for mother on the original birth certificate. *Id*. at 808. After C.B.W.'s

---

[1]    The background facts in this section are taken from our opinion in the prior appeal. The jury-trial testimony from the underlying proceeding is discussed below in the section of the opinion addressing Berwick's sufficiency-of-the-evidence challenge.

birth, Berwick and Wagner brought him to Houston, where they lived together as a family for several years. *Id.* at 808.

In 2008, Berwick ended his relationship with Wagner. *Id.* In response, Wagner filed the underlying Suit Affecting the Parent Child Relationship (SAPCR) seeking an order naming Wagner and Berwick joint managing conservators of C.B.W. *Id.* Berwick counterclaimed, seeking to be named sole managing conservator and arguing that Wagner lacked standing as a parent to seek custody because only Berwick, but not Wagner, was biologically related to C.B.W. through use of Berwick's sperm to conceive C.B.W. *Id.*

In a separate proceeding, Wagner then registered, as a foreign judgment, the California "Judgment of Paternity," under section 152.305 of the Texas Family Code, which provides for registration and confirmation of child-custody determinations from other jurisdictions. Under that section, after proper notice and an opportunity to contest the registration are given to appropriate parties, a trial court is required to confirm the judgment. *See* TEX. FAM. CODE ANN. § 152.305(d) (Vernon 2013) (providing that the court "shall confirm the registered order unless the person contesting registration establishes" that (a) the issuing court lacked jurisdiction, (b) the judgment has been vacated, stayed or modified, or (c) proper notice was not given of the registration proceedings). "Confirmation of a

3

registered order . . . precludes further contest of the order with respect to any matter that could have been asserted at the time of registration." *Id*. § 152.305(f).

Berwick timely contested registration, and the trial court combined—for purposes of briefing, evidence, and a hearing—the issues of (1) whether confirmation of the California judgment was proper under section 152.305 in the registration proceeding, and (2) whether Wagner had standing in the underlying SAPCR proceeding. The trial court concluded that confirmation was proper, and that Wagner had standing to bring the underlying SAPCR. *Berwick I*, 336 S.W.3d at 808–09.

Berwick brought an accelerated appeal from the trial court's order confirming the registration. *See* TEX. FAM. CODE § 152.314. We affirmed the trial court's order, *Berwick I*, 336 S.W.3d at 816, and the supreme court denied Berwick's petition for review.

## THE UNDERLYING SAPCR PROCEEDINGS

After a two-week trial, the jury in the underlying SAPSR case found that Wagner should be appointed C.B.W.'s sole managing conservator. On June 15, 2012, the trial court entered an order on the jury's verdict appointing Wagner sole managing conservator and Berwick possessory conservator. The trial court's order

4

also denied Berwick's request that C.B.W.'s name be changed.  Berwick timely appealed.[2]

## ISSUES ON APPEAL

Berwick brings the following six issues challenging the trial court's judgment:

1. "The California Judgment of Paternity Cannot be Enforced."

2. "Berwick's Paternity Claim Must Be Adjudicated."

3. "Prospective Jurors May Not be Challenged for their Religious Beliefs."

4. "The Introduction of Evidence That Berwick is C.B.W.'s Biological Father is Mandatory."

5. "C.B.W.'s Name is a Jury Issue."

6. "The Verdict is Against the Overwhelming Weight of the Evidence."

## THE CALIFORNIA JUDGMENT

### A.    Parties' Arguments

In his first issue, Berwick contends that registration of the California Judgment of Paternity in Texas "does not mean that it is enforceable."  He argues that the California judgment's adjudication of Wagner as a parent should not be

---

[2]    After this cause was set for submission, the Court discovered that the clerk's record did not contain a copy of the court's charge or the jury's verdict.  After the district clerk's office indicated that the trial court's file did not contain copies of these documents, we abated the appeal on October 3, 2013 and instructed the parties (and, if necessary, the trial court) to comply with the procedures set forth in rule 34.5(e) of the Texas Rules of Appellate Procedure ("Clerk's Record Lost or Destroyed").  We reinstated the appeal on January 20, 2014 after the clerk's office located the jury's verdict and filed it with the Court.

recognized because it "is contrary to Texas law." Because "[e]stablishing the parentage of Texas children is a matter of great public importance" that Texas has elected to provide for statutorily, and because "Wagner does not meet the statutory requirements," the California judgment "is against Texas public policy and, . . . therefore, unenforceable in this matter."

Specifically, Berwick points to the Texas Family Code's provision defining "parent" as "an individual who has established a parent-child relationship under Section 160.201." TEX. FAM. CODE § 160.102(11). Section 160.201 in turn states that the "father-child relationship" is established between a man and a child by unrebutted presumption, effective acknowledgment, adjudication of paternity, adoption, or the man's consenting to assisted reproduction by his wife. Because, according to Berwick, Wagner does not meet the definition of a parent under section 160.102(11), the "conclusion is inescapable—under Texas law, Wagner is not a parent of C.B.W," and "[w]hether Wagner established a 'parent-child relationship' under . . . the California Family Code is immaterial to this proceeding."

Berwick acknowledges that the Texas Family Code provides that "[a] court of this state may grant any relief normally available under the law of this state to enforce a registered child custody determination made by a court of another state," but argues that because the California judgment "recognized two men as C.B.W.'s

6

parents," it is "a judgment that is not 'normally available under the law of this state." Similarly, he contends that "while California may allow Wagner to occupy the legal space reserved for 'mother,' or a 'second father' in California [on a birth certificate], that same result is not available in Texas."

Berwick asserts that, unlike Wagner, he is both C.B.W.'s actual father because C.B.W. was conceived with Berwick's sperm and his "presumed father under Texas law because 'during the first two years of the child's life, he continuously resided in the household in which the child resided, and he represented to others that the child was his own.'" TEX. FAM. CODE § 160.204(a)(5). "In stark contrast," he argues, "although Wagner resided in the home with the child for the first two years of the child's life, Wagner could not genuinely represent to others that C.B.W. was his own because of Berwick's undisputed paternity and Wagner's confessed knowledge thereof." According to Berwick, these facts leave this Court with only two options: (1) enforce the California judgment as establishing only a presumption of paternity for both men, and then adjudicate Berwick *only* as the actual father, because "[a] child can have only one legal father," or (2) "enforce the California judgment as to *only* its adjudication of Berwick as the child's 'parent' and 'father.'"[3]

---

[3] From this, Berwick also reasons that "the California judgment . . . cannot confer standing on Wagner as a 'parent'" but, "on the other hand, Berwick does have standing to seek relief as the presumed father, as well as the right to seek an

7

In addition to arguing that Wagner cannot be C.B.W.'s parent under Texas law, Berwick argues that the "gestational surrogacy agreement that gave rise to the California judgment is void under Texas law." He contends that "the California judgment is the regurgitation of the gestational surrogacy agreement in the form of a judicial decree—nothing more," and notes that, under Texas law, "the intended parents must be married to each other" for a gestational surrogacy agreement to be enforceable. TEX. FAM. CODE § 160.754(b). And, he notes, Texas law does not recognize his marriage to Wagner, despite their obtaining a marriage license in Canada. *In re J.B. & H.B.*, 326 S.W.3d 654, 664–64 (Tex. App.—Dallas 2010, pet. granted). Because "[w]hat cannot come in the front door should not be permitted entrance through another," Berwick argues that we should not allow Wagner to "rely upon the gestational surrogacy agreement to make him a parent under Texas law."

Relatedly, in his second issue, Berwick argues that the trial court erred in refusing to adjudicate his paternity under section 160.631(a) of the Texas Family Code, which states that the district court "shall apply the rules stated in this section to adjudicate the paternity of a child." Because he proffered the results of genetic testing in an offer of proof in the underlying court, and because he sought to follow the statutory scheme for disproving Wagner as C.B.W.'s father and instead proving

---

adjudication of paternity as the 'man whose paternity of the child is to be adjudicated.'"

8

himself as C.B.W.'s father, Berwick urges us to render judgment in his favor on his paternity claim.

In response to Berwick's first issue, Wagner contends that it is not "enforcement" of the California paternity judgment at issue, but instead "recognition" of that judgment. Wagner argues that "every final judgment rendered in a sister state, including the California parentage judgment that established Berwick and Wagner as C.B.W.'s legal parents, is entitled to full faith and credit in every other state as a matter of federal constitutional law." *See* U.S. CONST. art. IV § 1 ("Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other state.").

Wagner notes that Berwick cites only choice-of-law cases in arguing that we must examine our State's public policy in determining whether the trial court properly gave effect to California's parentage judgment, rather than cases applying the full-faith-and-credit clause to other states' final judgments. He contends that "Texas courts are not required to apply the laws of other states to adjudicate disputes in the first instances where no prior judgment has resolved the same issue between the parties." Observing that "[e]ach of the pre-judgment cases cited by Berwick falls into this category, where the court is faced with the prospect of applying the substantive law of a different jurisdiction that conflicts with Texas law," Wagner argues that the cases simply do not apply here. In other words, it is

9

irrelevant whether his and Berwick's surrogacy contract would have been enforceable if entered in Texas in the first instance because "[w]hen presented with a final judgment from another state, Texas may not first look behind the judgment to determine if Texas agrees with the law and application of that law giving rise to it before deciding whether Texas will recognize and enforce it."[4] *E.g.*, *Baker by Thomas v. General Motors Corp.*, 522 U.S. 222, 233, 118 S. Ct. 657, 664 (1998) ("[O]ur decisions support no roving 'public policy exception' to the full faith and credit due *judgments*.").

Finally, Wagner argues that "the requirement that Texas give full faith and credit to the California parentage judgment does not implicate any Texas public policy embodied in the Texas Constitution's prohibition on same-sex couples marrying." TEX. CONST. art. I, § 32. California law does not require that intended parents under a surrogacy agreement be married and, Wagner notes, the California parentage judgment "addresses only the relationships Berwick and Wagner each have with C.B.W., not any relationship they have with each other." Thus, he contends, "[n]either one's relationship with C.B.W. is dependent on being married to each other, so nothing in the parentage judgment could violate the Texas marriage amendment."

---

[4] Wagner disputes that the California surrogacy agreement offends Texas public policy simply because it would not be afforded the same special procedural protection provided certain married people under Texas law. *See* TEX. FAM. CODE § 160.754.

In response to Berwick's second issue, Wagner contends that the trial court property rejected Berwick's request that his parentage be adjudicated. Specifically, Wagner argues that litigating Berwick's paternity is improper because Berwick has already been adjudicated C.B.W.'s legal parent. Moreover, Wagner asserts, allowing Berwick to revisit paternity simply to attempt to sever Wagner's parental relation by collaterally attacking the final parentage determinations of the California court is improper, inequitable, and violates principles of res judicata, judicial estoppel, and quasi-estoppel.

**B.    ANALYSIS**

We begin with the observation that it is Wagner's standing and parentage that is at issue here. Wagner filed the underlying SAPCR seeking a possession order related to C.B.W., and he has never challenged Berwick's standing or parentage. Berwick, on the other hand, responded to Wagner's SAPCR petition by arguing (1) Wagner lacked standing to file a SAPCR because he is not a biological parent, (2) because there can only be one father under Texas law, Berwick's paternity should be litigated with genetic testing to demonstrate that he is the only one of the two that can be C.B.W.'s parent, (3) Wagner's parentage has never been adjudicated, and (4) even if Wagner had actually been adjudicated to be a parent, the trial court erred in recognizing Wagner as a parent because such designation would be void against Texas public policy.

11

Because we conclude that the trial court correctly recognized that Wagner and Berwick had each already been adjudicated C.B.W.'s parents by the California Judgment of Paternity, and because we also conclude that the trial court properly gave full faith and credit to that California judgment, we hold that the trial court did not err in refusing to litigate Berwick's paternity.

### A. Texas Gives Full Faith and Credit to Foreign Paternity Adjudications.

Berwick's brief states that "[i]t does not appear that Texas courts have considered whether *judgments* obtained in other states are enforceable in Texas when they are contrary to Texas law." (emphasis added.) Thus, Berwick argues that we should analogize to, and apply, Texas cases holding that "contracts and other agreements entered into outside of Texas are not enforceable when they violate Texas law, even when they would be enforceable under the laws of other states." This argument both (1) improperly conflates the constitutional principles of full faith and credit with choice-of-law policy considerations, and (2) ignores settled Texas law holding that foreign judgments are entitled to full faith and credit without regard to public policy concerns.

The United States Constitution mandates that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State." U.S. CONST. art. IV, §1. Texas courts have thus consistently recognized that the "full faith and credit clause requires that a valid judgment from

12

one state be enforced in other states regardless of the laws or public policy of the other states." *Bard v. Charles R. Myers Ins. Agency, Inc.*, 839 S.W.2d 791, 794 (Tex. 1992). "In other words, a judgment rendered by a sister state is entitled to the same recognition and credit in this state as it would receive in the state where it was rendered and its validity is determined by the laws of the state where it was rendered." *In re Dalton*, 348 S.W.3d 290, 294 (Tex. App.—Tyler 2011, no pet.).

This full faith and credit has been repeatedly applied in Texas to other state's adjudication of parentage. *See e.g.*, *Bjorgo v. Bjorgo*, 402 S.W.2d 143, 147 (Tex. 1966) (holding Kentucky judgment "adjudicate[ing] the defendant to be the father of the child and impos[ing] a duty to support the child" entitled to full faith and credit); *Villanueva v. Office of the Attorney Gen. of Tex.*, 935 S.W.2d 953, 956 (Tex. App.—San Antonio 1996, writ denied) (rejecting request for genetic testing and holding that because "the language in [an] Indiana order constitutes a finding of Villanueva's parentage," its "determination of Villanuevan's paternity and its res judicata effect must be given full faith and credit by Texas courts"); *Retzlaff v. Courteau*, No. 03-01-00647-CV, 2002 WL 31386042, at *5 (Tex. App.—Austin Oct. 24, 2002, pet. denied) (not designated for publication) ("We must give full faith and credit to the facially valid New York paternity order.").

13

**B. The California Judgment is entitled to full faith and credit**

The California Judgment is entitled "Judgment of Paternity" and states "Petitioner Richard Thompson Wagner has judgment in that Petitioner Richard Thompson Wagner is declared to be a legal parent." This Court has already held that the judgment was properly registered in Texas, and that the California court had jurisdiction to enter the judgment. *Berwick I*, 336 S.W.3d at 816. The trial court correctly decided that this final, unappealed judgment adjudicating Wagner as C.B.W.'s parent—a judgment entered at the request of Berwick, Wagner, and C.B.W.'s surrogate mother and her husband—is entitled to full faith and credit. And none of the arguments Berwick advances in support of his position that the trial court erred are supported under Texas law.

The bulk of Berwick's argument is focused on public policy. He contends that we should consider the California judgment void because, he asserts, under Texas law, (1) "[a] child can have only one legal father," and (2) surrogacy agreements are unenforceable unless the intended parents are married persons of opposite gender. Berwick cites no authority for deeming a foreign paternity judgment to be so repugnant to Texas policy to render it void and subject to collateral attack. And Berwick's arguments ignore the strong state public policies favoring stability and finality in matters of parentage evidenced by numerous statutes. *See e.g.*, TEX. FAM. CODE ANN. §153.001 ("The public policy of this state

14

is to: (1) assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child, (2) provide a safe, stable, and nonviolent environment for the child; and (3) encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage."); TEXAS FAM. CODE ANN. § 162.012 ("[T]he validity of an adoption order is not subject to attack after six months after the date the order was signed."); TEX. FAMILY CODE ANN. § 160.307 (imposing restrictions on the ability of a party acknowledging paternity to rescind that acknowledgement).[5]

Because we conclude that the trial court correctly gave full faith and credit to the California judgment adjudicating Wagner's status as C.B.W.'s parent, we overrule Berwick's first issue. Because Berwick has already been adjudicated to be C.B.W.'s parent, we overrule Berwick's second issue.

---

[5] These policies favoring stability and finality in parent-child relationships have been recognized by Texas courts rejecting arguments similar to Berwick's in the same-sex adoption context. *Cf. Goodson v. Castellanos*, 214 S.W.3d 741, 745 (Tex. App.—Austin 2007, pet. denied) (rejecting biological mother's argument that judgment creating parent-child relationship between her child and biological mother's ex-girlfriend was void as against Texas public policy and citing the strong policies favoring stability and finality in matters of parentage); *Hobbs v. Van Stavern*, 249 S.W.3d 1, 2 & 4 n.4 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (citing same policy considerations in rejecting biological mother's untimely collateral attack on same-sex adoption by ex-girlfriend while applying statute rendering adoption judgment unassailable after six months); *see also in RE S.D.S.-C*, No. 04-08-00593-CV, 2009 WL 702777, at *2 (Tex. App.—San Antonio March 18, 2009, pet. denied) (mem. op.) (rejecting, as untimely, collateral challenge to same-sex adoption brought four years after judgment entered).

**EVIDENCE THAT BERWICK IS C.B.W.'S BIOLOGICAL FATHER**

In his fourth issue, Berwick argues that the trial court abused its discretion by excluding evidence at trial that he is C.B.W.'s biological father. His argument rests solely on the statutory presumption that it is in the best interest of a child that "a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child." TEX. FAM. CODE ANN. § 153.131(a). In support, Berwick cites three cases applying this presumption—each involving custody disputes between a parent and a non-parent. *Lewelling v. Lewelling*, 796 S.W.2d 164, 166–67 (Tex. 1990) (in dispute between parent and grandparents, statutory presumption favored placement with parent); *In re W.G.W.*, 812 S.W.2d 409, 413 (Tex. App.—Houston [1st Dist.] 1991, no writ) (in dispute between parent and non-parent ex-husband, statutory presumption favors placement with parent); *In re Smith*, 262 S.W.3d 463, 465 (Tex. App.—Beaumont, 2008, orig. proceeding) (in dispute between parent and non-parent ex-partner, statutory presumption favors placement with parent).

Our recognition of Wagner as C.B.W.'s legal parent (as adjudicated by the California judgment) renders Berwick's reliance on authority favoring parents over non-parents inapposite. Nothing under Texas law supports Berwick argument for applying a presumption in favor of a biological "parent" over a parent acquiring "parent" status through other legal channels (be it adoption, presumption, or

16

assisted reproduction). Although Berwick's brief treats these concepts interchangeably throughout, under the plain language of the Texas Family Code, only the difference between a parent and a non-parent has legal significance in determining who should be appointed sole or joint managing conservator of a child, *e.g.*, TEX. FAM. CODE § 153.131(a); the difference between a biological parent and a non-biological parent does not. Berwick cites no authority otherwise.

The issue of conservatorship of C.B.W. was submitted to the jury with the correct instruction that his "best interest" was the primary consideration. Berwick's only argument in support of admission of paternity evidence is the jury's purported need for this information to properly apply section 153.131(a)'s presumption in favor of parents over nonparents. Because we have rejected Berwick's argument that a statutory presumption exists favoring biological parents over non-biological parents under section 153.131, and because he has not advanced any other argument in favor of admission of this paternity evidence, he has not carried him burden of establishing that the trial court erred by excluding this evidence.

Moreover, to obtain reversal based upon exclusion of evidence, an appellant must not only show error, but also that such error was reasonably calculated to cause and probably did cause rendition of an improper judgment. TEX. R. APP. P. 44.1; *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989). To

demonstrate such harm, the appellant must show "that the excluded evidence was both controlling on a material issue and not cumulative of other evidence." *Bartosh v. Gulf Health Care Center-Galveston*, 178 S.W.3d 434, 439 (Tex. App.— Houston [14th Dist.] 2005, no pet.) (citing W*illiams Distrib. Co. v. Franklin*, 898 S.W.2d 816, 817 (Tex.1995) (per curiam)).

Here, the trial court excluded from evidence genetic testing and testimony that Berwick was C.B.W.'s biological father. The court's decision was based upon the fact that Berwick and Wagner were already both adjudicated parents. Berwick nonetheless testified to C.B.W. being "my child" before the jury. The court then held a bench conference to discuss the ramifications of that testimony and possible mistrial. At that conference, Berwick's counsel began by arguing that, given the evidence that already come in, it was already pretty clear to the jury "as to who [C.B.W.] is biologically related to." Wagner's counsel agreed, stating "we are not naïve enough to think that some of those jurors haven't figured it out."

Specifically, the jury had already heard about Berwick telling Wagner that he would never work with him to co-parent because Wagner needed to move on and "get his own family," "his own little boy." The jury had also heard recordings of Berwick on different occasions telling Wagner that C.B.W. is "not your child," "not your son," accusing Wagner of "destroying my child," and mocking Wagner for being "in denial," and pretending that C.B.W. is actually his son. On another

recording Berwick told Wagner, "You are not his dad, You don't look anything like him. He looks nothing like you." The jury had also heard evidence that Berwick consistently told C.B.W. that Wagner was not his father, and evidence of Berwick's wish—almost immediately after his breakup with Wagner—that Wagner would accept his "limited role" as an "observer" "mentor" or family friend" of sorts or, at most "a godparent or godfather." Finally, the jury heard testimony from Berwick's wife, Shellie, that she and Berwick had hoped that Wagner would be denied standing to any pursue any rights to C.B.W. In other words, there was ample evidence before the jury that Berwick viewed C.B.W. as only his child and considered his connection with C.B.W. (including shared physical attributes) to be the only valid one.

Ultimately, the trial court instructed the jury to disregard Berwick's one statement, during his direct testimony, about C.B.W. being "my son," and instructed the jury that there were two pieces of evidence specifically naming both Berwick and Wagner as parents, (1) the California judgment and (2) the birth certificate.

Given this record, Berwick has not carried his burden to establish that exclusion of evidence that he was biologically related to C.B.W. was an abuse of discretion. In addition, the excluded evidence was cumulative, as Berwick's own

19

counsel acknowledged that that the jury clearly understood, from other evidence presented, that Berwick was the biological father.

We overrule Berwick's fourth issue.

**STRIKES FOR CAUSE**

**A. Parties' Arguments**

In his third issue, Berwick argues that "members of the venire were the victims of religious discrimination" because they "were denied their constitutional right to participate in this vital element of government based solely on their religious beliefs." Specially, he complains that the trial court improperly struck five jurors based on their religious beliefs. He concedes that "if a religious belief prevent a juror from performing a specific required duty," disqualification is proper. He contends, however, that the five venire stricken for cause in this case were stricken, "not because they could not pass judgment, but because of the nature of their sincerely held religious beliefs about sexual behavior."

Wagner responds that each of the strikes were proper, and that the venire members were not stricken because of their religious beliefs, but instead because each "admitted harboring personal biases and/or prejudices that would prevent deciding the case solely on the evidence presented and applying the law given."

## B. Applicable Law

A prospective juror who admits bias or prejudice is disqualified to serve as a juror. *See* TEX. GOV'T CODE ANN. § 62.105(4) (Vernon 1998); *Shepherd v. Ledford*, 962 S.W.2d 28, 34 (Tex. 1998). "This disqualification extends to bias or prejudice against the subject matter of the suit as well as against the litigants." *Houghton v. Port Terminal R.R. Ass'n*, 999 S.W.2d 39, 46 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (citing *Compton v. Henrie*, 364 S.W.2d 179, 182 (Tex. 1963)). If prejudice is not established as a matter of law, we review the trial court's ruling on a challenge for cause for abuse of discretion. *Molina v. Pigott*, 929 S.W.2d 538, 541 (Tex. App.—Corpus Christi 1996, writ denied); *Urista v. Bed, Bath, & Beyond, Inc.*, 245 S.W.3d 591, 596 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

## C. Analysis

The question of whether anyone's strong feelings about the parties' sexuality or marital status would impact their willingness or ability to follow the law requiring that their decision be based on C.B.W.'s best interest was explored in voir dire by each attorney. Although Berwick complains specifically about five potential jurors being stricken generally because of their religious beliefs, he does not actually provide any verniremember-specific analysis about these veniremembers, what they said, or the trial court's stated reason for striking them.

21

"The key response that supports a successful challenge for cause is that the veniremember cannot be fair and impartial because the veniremenber's feelings are so strong in favor of or against a party or against the subject matter of the litigation that the veniremember's verdict will be based on those feelings and not on the evidence." *Buls v. Fuselier, D.P.M.*, 55 S.W.3d 204, 210 (Tex. App.—Texarkana 2001, no pet.). We review the voir dire record in relation to the five stricken veniremembers in light of this standard, mindful of the fact that a veniremember that is unequivocally biased or prejudiced "cannot revive his eligibility by recanting an earlier expression of bias or prejudice." *Smith v. Dean*, 232 S.W.3d 181, 190 (Tex. App.—Fort Worth 2007, pet. denied), and that the trial court is "in a better position . . . to evaluate the juror's sincerity and his capacity for fairness and impartiality." *Cortez v. HCCI-San Antonio, Inc.*, 159 .W.3d 87, 92 (Tex. 2005).

Applying this standard to the specific information provided by these veniremembers, we conclude that the trial court did not abuse its discretion in finding these jurors to be disqualified. The trial court did not strike every panel member who indicated they might have religious objections to homosexuality; rather, the court struck only those jurors who unequivocally indicated that they held such strong convictions that they could not base their decisions on the law and evidence.

22

**1. Veniremember No. 5**

In response to general questions to the entire panel, Veniremember Number 5 indicated that he had a problem with a child having two legal fathers because of "religious beliefs." He also stated,

> I understand that it's more socially acceptable; however, I still, myself, personally do not believe in homosexuality. So I would automatically – I mean, I have a problem with this whole thing all together because I'm more of the traditional – you know, my mom and dad have been married 48 years last week. My brother and I grew up in a Christian home. That's how I am. So, yes, it's more socially out there, whether it's acceptable or not depends on the individual and I cannot accept it.

When later asked if he could "set aside your religious beliefs and follow Texas law?" he responded, "No." He stated that he perceived a conflict between his beliefs and the law, because,

> I am a Christian and the Bible does not preach or teach homosexuality. So, I'm predisposed to not believe that way and just because these men were in that type of relationship, that's their deal, but for me to judge or decide, I can't do that.

He also agreed that, "based on their sexuality" he "can't make a decision as to which place is in the best interest."

After Wagner requested that Veniremember number 5 be stricken for cause based on these comments, the court called him for individual questioning, where the following additional exchange took place:

> *Q*: Okay. Do you have any belief that you could be a fair juror in this case?

*A* : I don't believe so.

*Q*: Are your feelings so entrenched that you cannot listen to the evidence and render a fair and impartial decision?

*A*: Yes.

*Q*: And if that's the case, sir, even if the Judge were to instruct you that under the law you were only to consider certain things which are the evidence presented by the Court, would you obey the orders of the Court?

*A*: I have very strong feelings against homosexuality and that plays a major role in this case and it would affect my judgment on it.

I don't think I could fairly judge based on the way that I believe. If you're going to force me or make me, I don't agree with that, but I'm not going to say I'm not going to do what the law says, but I do have strong beliefs that will come into play in the decision making that I do.

The court struck him for cause, nothing that "he started out from the beginning being resistant to most questions, and I think that he does have some issue that might affect his judgment as he's testified to." The record does not support Berwick's assertion that Veniremember No. 5 was stricken because of his religious beliefs, rather than a bias that would prevent him from deciding the case on the facts and the law.

## 2.    Veniremember No. 13

In response to general questions to the entire panel, Veniremember Number 13 raised his hand to indicate that he had a religious issue with the case.

After Wagner requested that Veniremember number 13 be stricken for cause based on this response, the court called him for individual questioning, where the following additional exchange took place:

> *Q*: All right. When there was questioning going on earlier this morning, you raised your card about religious problems with this case.
>
> *A*: I'm a Muslim.
>
> *Q*: And as a Muslim, do you repudiate -- or do you not approve of homosexuality?
>
> *A*: That's right.
>
> *Q*: And is there anything that I could do or that my client could do to make you feel that he would be the best parent since he is a homosexual?
>
> *A*: I don't think so.
>
> *Q*: . . . Sir, if you were picked to sit on this jury and the Judge gave you a list of instructions and asked you to look at all of the evidence and lay it all, could you do that?
>
> *A*: Sure.
>
> *Q*: You could do that. And you could be fair and look at . . . And would it affect you that Mr. Berwick -- would you hold it against Mr. Berwick that at one point in time he was also a homosexual? Do you think -- he is equally at fault in that behavior. So you think they were both equally at fault?
>
> *A*: Yes, ma'am.
>
> *Q*: [T]hough Mr. Wagner remains gay and it is against your religion, it's that concept, correct?
>
> *A*: That is correct.
>
> *Q*: And are you telling this Judge you can put your deep personal beliefs aside?

25

*A*: I cannot really do that.  That's what I said. It's very hard, and I said, "no."

The court struck him for cause, opining that when he stated that he could put his feeling aside, he had not really understood what he was being asked.  Viewing the situation as a whole, the court stated the view that "he's pretty definite about how he feels."  The court also expressed the concern that his feeling were so strong that—rather than follow the law—he may refuse to decide one way or the other, resulting in a hung jury.

The record does not support Berwick's assertion that Veniremember No. 13 was stricken because of his religious beliefs rather than a bias that would prevent him from deciding the case on the facts and the law.

### 3.  Veniremember No. 33

In response to general questions to the entire panel, Veniremember Number 33 raised her hand to indicate that he had a religious issue with the case.

After Wagner requested that Veniremember number 33 be stricken for cause based on this response, the court called her for individual questioning, where the following additional exchange took place:

*Q*: Do you have a firm conviction or belief as we stand here today against homosexuality?

*A*: Yes, I do.

*Q*: Is there anything that I could do to rehabilitate Mr. Wagner, who is an admitted homosexual, to make him be even with a person who's declared themselves to be homosexual?

26

*A*: Do you want to rephrase that for me.

*Q*: In other words, are you going to hold it against Rick that he is homosexual and remains that way in this suit?

*A*: That is the life that he's chosen. I'm totally against it. I don't believe in it, but that is what he has chosen, and I don't believe in that lifestyle as well.

*Q*: So in that event, would it be fair to say that it would be very hard for you, as you stand here today, to place a child in that environment?

*A*: Yes, I have a bias against it.

*Q*: And is there any evidence that you could hear that you would be able to listen to and say, well, still that would be best for the child and place the child in that home.

*A*: I just don't believe. It's religion.

The court struck her for cause, because "she's indicate[d] that she's predisposed to make a decision for one and not the other without hearing a shred of evidence."

The record does not support Berwick's assertion that Veniremember No. 33 was stricken because of her religious beliefs rather than a bias that would prevent him from deciding the case on the facts and the law.

### 4. Veniremember No. 66

In response to general questions to the entire panel, Veniremember Number 66 raised her hand to indicate that she "cannot follow the law and follow the Judge's instructions in spite of your religious beliefs and make a decision as to which place is best for this child."

27

After Wagner requested that Veniremember number 66 be stricken for cause based on this response, the court called her for individual questioning, where the following additional exchange took place:

*Q*: . . . You appeared to have already predetermined a bias; is that correct?

*A*: Yes.

*Q*: And can you tell the Court what your bias is as you stand here today.

*A*: I consider this a very strange case for me. I've never had anything like this before. I'm very strong in my beliefs and I would lean toward the husband and the wife getting the little boy because I feel like it needs to be a home that God talks about. I do believe that people can change and I do believe they can get forgiveness.

*Q*: Do you believe the way you feel today would be fair to Mr. Wagner if you sat on this jury?

*A*: I don't think it would be fair to Mr. Wagner because I can't accept his way of life from the scriptures from what I'm taught.

*Q*: Is there -- are you telling the Court that you could not listen to the evidence, and if you heard facts that indicated that it would be better for the child to be in Mr. Wagner's home, you still couldn't do that because of his sexual orientation?

*A*: That's what I'm saying, yes.

The court struck her for cause, because "she indicated . . . she's already decided" how she would vote.

The record does not support Berwick's assertion that Veniremember No. 66 was stricken because of her religious beliefs rather than a bias that would prevent her from deciding the case on the facts and the law.

28

## 5. Veniremember No. 67

In response to general questions to the entire panel, Veniremember Number 67 indicated that she would "tip the scale" in favor of Berwick because he was married to a woman, and that she did not "think [she] could be fair to Mr. Wagner because . . . mothers are very important."

After Wagner requested that Veniremember number 67 be stricken for cause based on these comments, the court called her for individual questioning, where the following additional exchange took place:

*Q*: [Y]ou were very responsive to the questions this morning. And I have to ask you, as we stand here today, have you already made up your mind where this child should be?

*A*: Well, I think I said that I didn't think I would be fair to Mr. Wagner because I don't think it would be good for a child to be with just, you know, a homosexual man. I would prefer him to be with a mother and a father.

*Q*: And so, without any other testimony, you hold that belief and you're entitled to that belief, but that's a very strong belief?

*A*: It's a strong belief and that's what I believe.

*Q*: Under any circumstances could you be persuaded otherwise?

*A*: I don't think it's – I don't think it's a good environment. I don't.

*Q*: If you heard other facts that you may not have heard yet in evidence, that you also disagree with, could you consider those facts and then if you determine that under those circumstances it would be better for the child to be in the single-parent home, would you be able to make that decision?

*A*: Well, if I heard that the child was being beaten and locked up in a closet, you know, things like that. I mean, you know, if I heard something like that, you know, it would have to be very extraordinary for me to -- you know, I tried to tell you my position, but I don't think that that is a good environment for the child to be brought into.

*Q*: And I appreciate that.

*A*: And you know, I mean, if a child was being beaten and tortured. You know, yeah, I would do it, but I don't, you know, you can't say that I'm going to go for a single, homosexual man when I don't think it's a good environment. I don't.

The court struck her for cause. The record does not support Berwick's assertion that Veniremember No. 67 was stricken because of her religious beliefs rather than a bias that would prevent him from deciding the case on the facts and the law.

We overrule Berwick's third issue.

## LEGAL AND FACTUAL SUFFICIENCY

In his sixth issue, Berwick challenges the sufficiency of the evidence to support appointment of Wagner as sole managing conservator.

### A. Standard of Review

"Jury findings underlying a conservatorship appointment are subject to ordinary legal and factual sufficiency review." *In re N.L.D.*, 412 S.W.3d 810, 817 (Tex. App.—Texarkana 2013, no pet.); *Corrales v. Dep't of Family & Protective Servs.*, 155 S.W.3d 478, 488 (Tex. App.—El Paso 2004, no pet.). Under a legal sufficiency review, we consider only the evidence and inferences that support a

factual finding in favor of the party having the burden of proof in a light most favorable to such findings and disregard all evidence and inferences to the contrary to determine whether there is any probative evidence which supports the finding. *Corrales*, 155 S.W.3d at 488. When reviewing a claim of factually insufficient evidence, we must consider all of the evidence and determine whether the jury finding or verdict is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust. *Id.* at 488–89.

**B. Analysis**

The jury was properly instructed to "appoint both joint managing conservators unless you find that such appointment is not in the best interest of the child." In making that determination, it was instructed to consider:

1. Whether the physical, psychological, or emotional needs and development of the child will benefit from the appointment of joint managing conservators.

2. The ability of the parents to give first priority to the welfare of the child and reach shared decisions in the child's best interest.

3. Whether each parent can encourage and accept a positive relationship between the child and the other parent.

4. Whether both parents participated in child-rearing before the filing of the suit.

5. The geographical proximity of the parents' residences.

6. Any other relevant factor.

When both legal and factual sufficiency points are raised, we must first examine the legal sufficiency of the evidence. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex.1981). In conducting a legal sufficiency review in conservatorship cases, an appellate court reviews all the evidence in a light favorable to the finding, crediting favorable evidence if a reasonable fact-finder could do so and disregarding contrary evidence unless a reasonable fact finder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In reviewing a no-evidence point, the appellate court must view evidence in the light that tends to support the finding of the disputed fact, and it must disregard all evidence and inferences to contrary. *Lenz v. Lenz*, 79 S.W.3d 10, 13–14 (Tex. 2002); *Lewelling*, 796 S.W.2d at 166; *In re D.A.*, 307 S.W.3d 556, 561 (Tex. App.—Dallas 2010, no pet.).

**1. The evidence is legally sufficient to support the jury's finding that appointment of Wagner as sole managing conservator was in C.B.W.'s best interest**

Wagner testified that, beginning in 1994, he and Berwick had a good relationship for 14 years. Berwick and Wagner were married in Canada in 2003 and later entered a declaration of domestic partnership in California. At that time, it was important to Berwick to formalize their longtime relationship because he was a big advocate of gay marriage rights and Berwick wanted to start a family.

Wagner and Berwick began researching and taking steps to understand what having a child would mean to their lives, and what having same-sex parents could mean to their future children. They also researched their options for having children, including local adoption, international adoption, and fostering before ultimately settling on assisted reproductive technology through use of a surrogate. C.B.W.'s birth in December 2005 was the result of their third surrogacy attempt. Wagner testified that Berwick did not indicate to him until more than two years after C.B.W.'s birth—and after they were done attempting to have more children—that he was reconsidering his sexual identity.

Wagner and Berwick both took 12-week leaves from work upon C.B.W.'s birth, and hired a nanny, Silvia, who worked for them full-time from 2005 through the summer of 2010. Soon after Wagner went back to work, Berwick became able to work from home. According to Wagner, C.B.W. benefited from a very loving, stable home life and circle of family and friends for the first three years of his life.

Wagner testified that March 2, 2008 was the first time Berwick confided that having C.B.W. had "made him reconsider this sexual orientation." Wagner testified that Berwick told him that he loved him and that he was his soulmate, but that Berwick could "no longer succumb to his homosexual tendencies." Wagner was devastated because that revelation had come out of the blue.

Wagner testified that, in the three months between Berwick's statement in March 2008 and the summer of 2008, things were very open and "not antagonistic at all." In March 2008, both in conversations and in an undelivered letter introduced in evidence, Berwick called Wagner his best friend and soulmate, but stated that he could no longer succumb to homosexuality that he considered a mental illness. The letter went on to say that they needed to make decisions about C.B.W., but represented that he and Wagner could continue to co-own their home on Roseland Street and suggested that Berwick might buy a place in the country and commute back to the Roseland house to visit C.B.W.

The vernacular and vocabulary quickly changed though, over the next month and a half, with Berwick saying things to him such as, (1) "homosexuality is sinful and evil and disgusting and vile and that homosexuals have Satan within them," (2) C.B.W. shouldn't have a nanny . . . He should have a mother," and (3) "You're not really [C.B.W.'s] father. Your parents are not really his grandparents. Your sister and brother are not really his aunt and uncle." Wagner testified that Berwick also viewed people in their lives that were gay differently, looking back to find things to criticize, sometimes "going back 5, 10, 15, 20 years before to find some fault with them."

Most upsetting to Wagner was that Berwick stopped respecting him as a father in front of C.B.W. And Berwick started sharing his negative views about

34

homosexuality and Wagner in front of C.B.W. and others.   In the summer of 2008, Berwick met with a clinical social worker, went on a weekend retreat, and returned elated.  Berwick told Wagner that he had spoken to God and the devil, and that God assured him that Wagner had been his guardian angel, protecting him in life until that point, but that Berwick was not actually gay; instead he was "heterosexual with the same-sex attraction problem."  Wagner was bothered that Berwick became very secretive, explaining that part of "the process" required such secrecy.

Within four or five weeks of Berwick's return from this retreat, Berwick also told Wagner that Berwick's sister Michelle considered homosexuality to be a sin, and that Berwick's mother and Michelle had "angrily and adamantly told [Berwick] to accept nothing less than one hundred percent custody and kick [Wagner] out."  In August 2008, Berwick told Wagner he wanted to move to the Woodlands (about 45 miles away) with C.B.W., that he had put down a deposit on a house there across the street from his sister Michelle, and that he had located a townhouse that Wagner could live in a few miles away.

Berwick also began researching how he and Wagner could get divorced from their Canadian marriage, which was registered in California.  He told Wagner that he wanted to change C.B.W.'s last name, that he wanted to move C.B.W. to

the Woodlands, and that—if Wagner put up a fight—Berwick would sue for sole custody and get it. In response, Wagner hired a family law attorney.

Shortly thereafter, at the end of August 2008, the parties entered a Rule 11 Agreement designed, in part, to preserve the status quo for C.B.W. Berwick cancelled his lease on the house in the Woodlands and stayed at Roseland house. The Rule 11 covered some basic tenets of the three of them living under the same roof at the Roseland house. For example, it provided that Berwick and Wagner would alternate weekends where they would leave Friday night and return Sunday night to allow the other one exclusive parenting time at the home. Although not provided for in the Rule 11, a weekday routine also evolved in which the they would alternate nights with the evening routine with C.B.W. The Rule 11 provided that their nanny Silvia would continue to care for C.B.W. on weekdays. Wagner liked this agreement and resisted putting the Roseland house on the market because he wanted to preserve C.B.W.'s environment until custody and living decisions were ironed out. Under the Rule 11, Berwick could take C.B.W. to the Woodlands or elsewhere on the weekend if he chose to.

In January 2009, Berwick started dating Shellie, who he met on eHarmony; they married in November. Berwick approached Wagner a couple of weeks before the wedding and asked what Wagner thought Berwick should do about their living arrangements and Berwick's upcoming marriage. Wagner suggested that, since

Shellie's house was only 8 miles away, Berwick could move there (or to a new house in the Woodlands if he preferred) and drive to the Roseland house every weekday to work in his home office. Every other night during the week, Wagner suggested, Berwick could stay with C.B.W. for the evening as he already did, and then return to Shellie's house to sleep. Berwick instead moved Shellie into the Roseland house the day after she and Berwick were married. Wagner testified that he was surprised to come home and discover padlocks on some of the interior doors and Berwick and Shellie taking pictures of everything in the house. Berwick was very uncooperative about decisions to do with C.B.W. that were not expressly spelled out by the Rule 11. Things were contentious between Wagner and Shellie.

As problems escalated, Berwick and Wagner argued more and, at times, screamed at each other. According to Wagner, after Wagner asked Shellie to quit sending their nanny away, Berwick filed a false police report accusing him of having pushed Berwick and C.B.W. After Wagner became convinced that Berwick was at the house to try to build a false record that Wagner was violent, Wagner began secretly carrying a tape recorder every day to record their interactions. He was leery of Shellie's ability to be a false witness against him and viewed the tape recorder as his own "witness" about actually happened. Wagner was candid in his testimony that he said things to Berwick and Shellie that he wished he could take back.

Wagner testified about numerous areas that Berwick was not cooperative in co-parenting. After Shellie and Berwick were married, Wagner and Berwick were not able to agree on a pre-K for C.B.W. Wagner wanted him to start a pre-school outside the home part-time to work on socialization and academics while gradually reducing his time with their nanny. Berwick refused to agree to a local program, instead proposing that C.B.W. ride to Channelview to Shellie's work everyday to attend full-time daycare there. They never reached an agreement. When it came time to do HISD magnet and Vanguard applications for kindergarten, despite their earlier agreement to send C.B.W. to an HISD school, Berwick was very uncooperative with Wagner's efforts to evaluate the schools and submit applications. Wagner tried to coordinate Vanguard testing dates and parent questionnaires and Berwick responded with unresponsive emails informing Wagner instead that he better not represent himself as C.B.W.'s father on any of the school applications or he will be "committing a felony in the State of Texas."

Berwick then told Wagner that he wanted C.B.W. to go to school in the Woodlands. Eventually, after C.B.W. tested into, and received a spot, at a good HISD school, Berwick notified Wagner that he had no right to enroll him there, and that he would instead look at their zoned school (which Berwick had previously deemed unacceptable). Wagner obtained a court order to permit him to enroll C.B.W. in kindergarten. In dealing with the school, Berwick would identify

38

himself as C.B.W.'s only father, and resisted efforts by Wagner to ensure that the teachers and school understood that C.B.W. has two fathers. Wagner testified that he fears Berwick will try to pull C.B.W. from that school next year.

C.B.W. had been covered by Wagner's health insurance since birth. In 2008, Berwick told Wagner he was going to purchase secondary insurance for C.B.W. just to ensure adequate coverage. Then, without notifying Wagner, Berwick went to all of C.B.W.'s healthcare providers and changed insurance information and contact information from the Roseland house to Shellie's house.

Wagner testified that, even with attempted assistance by C.B.W.'s amicus attorney, they have been unable to reach agreements about holidays that would allow Wagner to travel with C.B.W. to see family, despite Wagner offering reciprocal one-week periods for the holidays.

Although Berwick had told Wagner that he did not want a nanny for C.B.W. because he needed a mother instead, Berwick did not tell Wagner before he sent a letter to their longtime nanny in June 2010 telling her that her services were no longer needed during any period of Berwick's possession. Wagner testified that this was just other example, in his eyes, of Berwick's unwillingness to work together and discuss parenting decisions. According to Wagner, he tried for a long time to co-parent through the use of third-party professionals and goodwill, and Berwick refused most, if not all, of those good faith attempts.

Wagner next testified that his biggest concern with regard to C.B.W.'s emotional well-being is how he feels about having same-sex parents and how he will feel about assisted reproductive technology. Wagner has reached out to Berwick and suggested a third-party professional be utilized to assist them in planning how to handle explaining these things to C.B.W. Berwick was not cooperative in that regard and, according to Wagner, when Berwick and Shellie were concerned about C.B.W. acting out in potentially inappropriate ways, they repeatedly tried to line up treatments and consultations without including Wagner in the decisionmaking processes.

Wagner testified that he and Berwick also agreed in the Rule 11 to engage a psychologist, Dr. J. Anderson, to evaluate them both. She did extensive research, incorporating interviews with the parties and information she requested from therapists that they had seen and others in their lives, such as their longtime nanny. Wagner also testified to reading parts of Berwick's journal and, after realizing it was full of entries about Berwick's thoughts on him and C.B.W., giving Anderson copies of the entries. Anderson issued a report in February of 2009.[6]

Dr. Anderson testified that, in her report, she recommended that Berwick and Wagner be appointed joint managing conservators, and that C.B.W. live with Wagner and have standard visitation with Berwick, so long as neither parent or

---

[6] According to Wagner, in response to Anderson's report, Berwick changed attorneys and "took a different approach to many things at that point."

their families has negative behaviors or words towards the other parent in his presence. Anderson said that the parties' sexual orientation did not play a role in her decisionmaking. She believes that Wagner presented as the more mature and stable adult who knows who he is. Berwick, on the other hand, has vacillated back and forth with his emotions and identity throughout his life in many ways. Also, in Anderson's view, Wagner had presented a much greater willingness to share decisionmaking and co-parent. Her conclusions were based in part on Berwick's telling Anderson at times that that Wagner has been "an angel who saved him" at times and then other times that Wagner "is a devil who was horrible, not good for" C.B.W., that he wishes that Wagner's role in C.B.W.'s life would just go away.

The jury also heard recordings of several arguments that took place in 2011 and 2012. Wagner testified that these conversations concerned him, and that they demonstrated that Berwick had no intention of fostering Wagner's relationship with C.B.W. or co-parenting. In one of those recordings, Berwick asked Wagner why he would not "move on" and "get his own family" and "his own little boy." He urged him to imagine life with his own wife, where Wagner is the leader of his own family and "your wife does the wifely duties and you do the man duties and you are part of a team. And you work together and you model this to your children." Berwick called Wagner's desire to continue to parent C.B.W. "delusional." Berwick told Wagner repeatedly that C.B.W. was "not your child"

and accused Wagner of "destroying my child" and "destroying my life" and told Wagner that "your homosexuality is the problem of my life." Berwick told Wagner that C.B.W. "deserves more than this and this is what I'm fighting for and this is why I will fight you until the day that I die." Berwick stated that he wanted to be able to look C.B.W. in the eyes one day and tell him that he did everything he could do (presumably to protect him from Wagner). In response to Wagner's request that they talk to a third party about how to deal with some of these issues with C.B.W. and "figure out how we're going to talk" about it, Berwick replied "I will not do anything with you. Nothing. Except fight you. And fight you. And fight you. And fight you. And fight you. That's what I'll do with you. You can go get your little mamby pamby psychologist, whatever . . . ." Berwick explained to Wagner that he believed if Wagner would simply get a wife, he would see the light to getting his own family and that, if he "really loved" C.B.W., he would leave. Berwick argued that C.B.W. deserves a mom and a dad, and that Wagner was not a father, but a pariah.

In another recording, Berwick repeatedly tells Wagner again that he is not C.B.W.'s dad, and that Wagner should hear what C.B.W. "says about you behind your back." Berwick told Wagner "You have lost. You will lose. You will never be the person you think you're going to be in [C.B.W.'s] life and I just wish you would realize that."

There was testimony from Silvia, C.B.W.'s nanny, that—before Berwick and Wagner's romantic relationship ended—Berwick would refer to Wagner in front of C.B.W. as "Daddy" or "Daddy Rick" but that, after the break-up, Berwick would refer to Wagner in front of C.B.W. as "Rick," Mr. Wagner," or "that man." In contrast, when speaking in front of C.B.W., Wagner continued to refer to Berwick as "Daddy or Daddy Jerry." Silvia also testified that Berwick would get upset if C.B.W. called Wagner "Dad" or "Daddy."

In a "personal life coaching initial questionnaire" that Berwick completed in the summer of 2008, he characterized Rick as the biggest obstacle to getting the most of life because he was hellbent on being a parent. That same summer, Berwick identified in his journal, as wishes for C.B.W., (1) he "have only one father and [Wagner] and I honor [C.B.W.] in this manner," (2) Wagner "assume a peripheral role as family friend . . . voluntarily avoid using the title of 'father' and not refer to his family as '[C.B.W.]'s family,'" (3) Wagner and Berwick decide "how [Wagner] will be in [C.B.W.]'s life. I would prefer as a family friend; however, I would be open to godparent or godfather if [Wagner] feels it's God's will," (4) "I will agree [Wagner will] have a limited role in [C.B.W.]'s life as observer to be a mentor of sorts. I encourage [Wagner] to find his own family as I have begun to do."

Berwick testified to his belief that he should be appointed sole managing conservator because it is in C.B.W.'s best interest to have a traditional home with a mom and dad. At the time of trial, he reaffirmed his current belief that, as a gay man, Wagner "serves in Satan's army" and is a "pervert."

Berwick, Shellie, Wagner, and C.B.W. were interviewed by another psychologist, R. Laval. Shellie indicated in that interview that she and Berwick had hoped that "the Court would determine that [Wagner] has no legal standing" because, although they did not want to cut Wagner completely out of C.B.W.'s life, she did "not think it would be good for [C.B.W.] to have two different fathers." During his interview, C.B.W. told Laval that Wagner told him that he has two fathers and Berwick tells him that he has only one father. Also, C.B.W. reported that Berwick told him that he can call Wagner "dad" so long as he does not call him that in front of Berwick.

Shellie testified at trial that she had told C.B.W., in front of Wagner, that he did not have two fathers. She also testified to referring to Wagner, in front of C.B.W., as "Mother Wagner." Shellie agreed that there have been major decisions that Berwick and Wagner have been unable to make regarding C.B.W.

The appellate court will sustain a legal-sufficiency or "no-evidence" challenge if (1) the record shows a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence

44

offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810. Thus, the court will sustain a legal sufficiency challenge only when the evidence is "so weak as to do no more than create a mere surmise or suspicion." *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006).

We conclude that the jury was presented with legally sufficient evidence to support its finding that appointment of Berwick and Wagner as joint managing conservators was not in the best interest of C.B.W. Joint managing conservatorship generally provides the conservators with joint decisionmaking authority in many important overlapping areas, including education and medical decisions. When a parent is instead appointed sole managing conservator, that parent is generally given exclusive decisionmaking rights in these and other important areas, unless limited by court order. TEX. FAM. CODE § 153.132.

As summarized above, there was significant evidence presented at trial demonstrating that—between the summer of 2008 and the trial in 2012—Berwick was not amenable to or cooperative in making joint decisions with Wagner about C.B.W.'s place of residence, education, medical needs, or therapeutic needs. There was also significant evidence that Berwick refused to encourage and accept a positive parent-child relationship between C.B.W. and Wagner. In light of this

evidence, we conclude the evidence is legally sufficient to support the jury's finding.

## 2. The evidence is factually sufficient to support the jury's finding that appointment of Wagner as sole managing conservator was in C.B.W.'s best interest

To determine whether the evidence is factually sufficient to support the trial court's order, we must consider, weigh, and examine all of the evidence that supports or contradicts the fact-finder's determination. *See Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). "We may set aside a verdict only if the evidence supporting it is so contrary to the overwhelming weight of the evidence as to be clearly wrong or manifestly unjust." *Mauldin v. Clements*, 428 S.W.3d 247, 268 (Tex. App.—Houston 2014, no pet.); (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam)). When conducting a factual sufficiency review, we must not merely substitute our judgment for that of the fact-finder. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The fact-finder is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Id*.

According to Berwick, "in naming Wagner the sole managing conservator the jury ignored the overwhelming weight of the evidence, which fails to support their conclusion." Berwick points to the opinion of the two psychologists who testified at trial, Anderson and Laval, that the parties should be appointed joint

46

managing conservators.[7] Berwick cites trial evidence and these expert's opinions about both Wagner's and Berwick's sincere commitment to parenting C.B.W. Berwick highlights the reasons that Laval cited as tipping the scale in favor of Berwick's being permitted to establish C.B.W.'s residence, such as Shellie's ability to stay home to care for C.B.W., and the loving ways in which Berwick and Shellie interact with C.B.W.

The focus of Berwick's analysis and evidence he discusses, however, does not go to the factors relevant to determination of sole versus joint managing conservatorship. All of the witnesses agreed that both Berwick and Wagner love C.B.W. and are good parents. But whether appointment of one parent as sole managing conservator is in a child's best interest turns not on the parent's ability to parent individually, but instead on several statutory factors related to the parents' ability to effectively *co-parent*. These include whether the parents can encourage and accept a positive parent-child relationship with the other parent, whether the parties can prioritize the child's welfare, and whether the parents can reach shared decisions in the child's best interest. TEX. FAM. CODE ANN. § 153.134(a)(West 2014).

---

[7] Anderson opined that it was in C.B.W.'s best interest for Wagner be given the right to establish C.B.W.'s legal residence and Laval opined that it was in C.B.W.'s best interest for Berwick be given the right to establish C.B.W.'s legal residence. They both recommended that Wagner and Berwick be appointed joint managing conservators.

Although Berwick and Shellie testified at trial that they accept Wagner as a parent and are willing and able to co-parent with him, they also both admitted this attitude was new. Berwick testified that he had decided to accept Wagner as C.B.W.'s parent during the course of the actual trial; Shellie testified that she changed her mind about Wagner's role in the "last couple of months" before trial. Faced with this testimony on the one hand, and evidence about Berwick's unwillingness to recognize Wagner as a parent entitled to participate in joint decision-making for much of the four years leading up to the trial on the other hand, the jury could have resolved this point against Berwick. *E.g.*, *Miller v. Churches*, 418 S.W.3d 749, 756–57 (Tex. App.—Dallas 2013, no pet.) (credibility and weight to be given testimony of both lay and expert witnesses is in province of the jury). There is factually sufficient evidence to support the jury's finding that appointing Wagner as sole managing conservator is in C.B.W.'s best interest.

We overrule Berwick's sixth issue.

## NAME CHANGE

The trial court refused Berwick's request to change C.B.W.'s last name after deciding that this was an issue for the court, rather than the jury. In its findings of facts and conclusions of law, the court made the following "findings in support of name change denial":

1.    The Child has been known as his legal name since his birth.

2. The Child's legal name was recorded on the Child's birth certificate.

3. All medical and educational documents refer to the Child by his legal name.

4. Both Wagner and Berwick initially agreed to the Child's name.

In his fifth issue, Berwick argues that the trial court erred in refusing to submit this issue to the jury because the Texas Constitution guarantees the right to trial by jury, TEX. CONST. ART. V, § 10, and the legislature has not expressly carved out name changes as an exception to that right.

Wagner disagrees, contending that there was no disputed issue of fact for the jury's consideration, and that whether to grant equitable relief is in the province of the court, not the jury. Wagner also contends that, in any event, the reasons Berwick articulated for wanting to change Wagner's name were all related to the his desires, not whether such change would be in C.B.W.'s best interest. Finally, Wagner argues that any error in failing to submit a jury question was harmless.

Neither party cites any authority specific to the issue of whether a party petitioning for a minor's name change is entitled to a jury finding on that issue, and we have located no authority requiring such request be submitted to the jury. We concur, however, in the trial court's view that this request for relief did not present a fact issue for the jury. Given that C.B.W's legal name was established by the California court at Berwick's request and that Berwick does not argue here that a

49

name change is in C.B.W.'s best interest, we cannot conclude that the trial court erred.

We overrule Berwick's fifth issue.

## CONCLUSION

We affirm the trial court's judgment.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Higley and Brown.