**Opinion issued May 19, 2022**



In The

# Court of Appeals

**For The**

# First District of Texas

———————————

## NO. 01-21-00143-CV

———————————

**CASA DE LA VALVULA S.A. CASAVAL S.A., Appellant**

**V.**

**BRAY INTERNATIONAL, INC. AND BRAY CONTROLS ANDINA LTDA, Appellees**

---

**On Appeal from the 151st District Court**
**Harris County, Texas**
**Trial Court Case No. 2019-89782**

---

## MEMORANDUM OPINION

In this interlocutory appeal, Casa De La Valvula S.A. Casaval S.A (Casaval) challenges the trial court's order denying its special appearance in a suit filed against it by Bray International, Inc. and Bray Controls Andina LTDA (collectively, Bray). Because the record supports the trial court's determination that Casaval contractually

consented to personal jurisdiction in an agreement it signed with Bray, we hold that the trial court did not err when it denied Casaval's special appearance.

We affirm.

## Background

Bray International, Inc. is headquartered in Houston, Texas and manufactures and sells valves and actuators. Bray International conducts business around the world through its subsidiaries and contracts with distributors to sell its products worldwide. Bray Andina is a Columbian company and subsidiary of Bray International that conducts distribution and sales activities for Bray International in Columbia.

Casaval is a Columbian company headquartered in Barranquilla, Colombia and sells vales and actuators. In 2007, Casaval and Bray entered into a written sales agreement (the Agreement). Pursuant to the Agreement, the parties agreed that Casaval would be a distributor of Bray's valves and actuators in Columbia. The Agreement was signed by Javier Padilla Madero (Padilla), the general manager of Bray's Mexican subsidiary, and by Carlos Daccarett, an owner of Casaval and its then-president. A provision in the Agreement stated that Bray or Casaval could cancel the agreement by giving a 45-day cancellation notice. However, if Casaval "actively market[ed] a product line competitive with Bray products, the termination date will occur immediately without delay." Another term of the Agreement required

2

Casaval to undertake "to fulfill the promotion of our products in all its offices and sales areas; [sic] without commercializing other butterfly valve or check valve brands, actuators, or accessories that may interfere with the success of this agreement." In other words, Casaval agreed not to distribute certain products of Bray's competitors.

The Agreement required the parties to renew the agreement annually, which the parties did for 12 years. As a result, Casaval distributed Bray's products in Columbia from 2007 until 2019. In July 2019, Bray notified Casaval in writing that it was terminating the Agreement. Among its reasons for termination, Bray stated that Casaval had failed to comply with the Agreement because it had agreed to sell the products of Emerson, Bray's "direct competitor."

In December 2019, Bray filed suit against Casaval, later amending its petition. In its amended petition, Bray alleged that, during the term of Agreement, Casaval had business relationships with other companies that had offices in Texas. For example, Bray alleged that, in 2018 and early 2019, Casaval had solicited quotes for purchasing valves from DelVal, another Bray competitor, which was headquartered in Texas.

Bray's amended petition also contained allegations that Casaval committed an anticipatory breach of the Agreement by repudiating its obligations under the Agreement. Bray alleged that, in March 2019, Casaval informed Bray that Emerson

was interested in forming a business relationship with Casaval. In response, Bray's general manager in Columbia informed Casaval that there was no "intersection point" for Casaval to work with Emerson and that "Bray [would] not accept it."

Bray further alleged that, in May 2019, Casaval's president traveled to Houston to meet with Bray's management to discuss what Casaval characterized as Bray's "bad management" and "irregularities" under the Agreement. Bray asserted that Casaval then sent it a letter "confirming the discussion from the Houston meeting and Casaval's allegations of 'bad management' by Bray under the Agreement." Bray claimed that Casaval's letter "further confirmed that it had bluntly told Bray in the Houston Meeting that if the 'bad management' did not change, Casaval would suspend Bray's brand and implement a line of products from Bray's competitors."

Bray claimed that Casaval's president had sent an email to Bray on May 31, 2019, to confirm "that Casaval told Bray in the Houston meeting that Casaval had already made the decision to initiate business dealings with Bettis, a division of Emerson," to purchase a specific type of actuator "to sell to [Bray's] most important customer in Colombia." Bray alleged, "[i]n short, Casaval bluntly told Bray the decision to distribute actuators of Emerson had already been made, and that decision was ratified by the President's May 31 correspondence with Bray." Then, "[o]n July 4, 2019, the President of Casaval sent an email to confirm the business relationship

4

with Bray was on 'standby' to any new purchase orders" until the parties' disputes were resolved.

Bray stated that it "terminated the Agreement [in July 2019] after Casaval announced that [it] had made the decision to sell Emerson valves" because "Bray simply cannot continue to do business with any of its authorized distributors that are engaged in the commercial promotion, marketing, or sale" of Emerson's competing products. Bray explained that it "wants its distributors to believe in the success of its products and not have split loyalties relating to the products they sell." Bray believed that "such split loyalties would very likely impact its customers' opinions regarding its products" and may lead Bray's other distributors to seek similar relationships with Emerson.

After setting out the foregoing factual allegations in its amended petition, Bray asserted that Casaval's "conduct" constituted a breach of contract and defamation. Bray also sought a declaratory judgment relating to its rights under the Agreement.

Asserting that the trial court had personal jurisdiction over Casaval, Bray alleged that Casaval had "significant business contacts" with Texas. Bray also alleged that Casaval had consented to personal jurisdiction in Texas. To support its assertion of consent, Bray attached a document to its amened petition that it asserted

was the Agreement between the parties. The top portion of the attached document's front page was as follows:



As shown, the front-page "Sales Agreement Document" provided: "This document represents an agreement between [Bray] and [Casaval], subject to all terms and conditions of the attached Bray Sales Policy." That page also contained additional terms, including granting Casaval the non-exclusive right to sell Bray's products in Columbia, and it was the Agreement's signature page.

The second page of the attached document had the following heading:



Bray's amended petition described Attachment A as "a one page document that contains additional terms and conditions that were specifically focused on the relationship between Bray and Casaval." Bray alleged that Attachment A "does not

contain any general sales policies of Bray and, thus, is not the 'Bray Sales Policies' referenced on page 1 of the Agreement."

The third page of the attached document was the first page of an 18-page document, which had the following heading:

**Bray Sales Policy**
**Sales Bulletin No. 1000**
**Date: January 2005, Page 1 of 18**

Bray alleged that this document was the Bray Sales Policy referenced in the front page "Sales Agreement Document." The fourth page of the 18-page Bray Sales Policy contained the following provision:

> **CHOICE OF LAW – THE VALIDITY, CONSTRUCTION, AND ENFORCEMENT OF THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF TEXAS. IN THE EVENT OF A DISPUTE CONCERNING THIS AGREEMENT, THE PARTIES AGREE THAT VENUE LIES IN A COURT OF COMPETENT JURISDICTION IN HARRIS COUNTY, TEXAS**.

Bray stated that Padilla was responsible for the negotiation and execution of the Agreement. Bray alleged that Padilla had provided the front-page Sales Agreement Document, Attachment A, and the 18-page Bray Sales Policy document to Casaval's representatives as part of the contractual offer. Bray claimed that, by signing the front page, which incorporated the Bray Sales Policy, Casaval had contractually consented to the trial court's personal jurisdiction based on language

7

in the Bray Sales Policy that venue for "a dispute concerning this agreement" would lie in Harris County.

After Bray filed its original petition, Casaval filed a special appearance. Casaval claimed that the trial court lacked personal jurisdiction over it and requested dismissal of the suit. Casaval asserted that it did not have systematic and continuous contacts with Texas to support general personal jurisdiction or sufficient minimum contacts with Texas to support specific personal jurisdiction. Casaval offered the affidavit of its president as evidence that it lacked sufficient contacts with Texas to satisfy jurisdictional requirements.

After Bray filed its amended petition, Casaval supplemented its special appearance. In addition to offering evidence to show that Casaval lacked sufficient contacts with Texas, Casaval offered evidence to show that it had not contractually consented to personal jurisdiction in Texas. Casaval offered the affidavit of Ivan Daccarett, one of Casaval's owners and the son of Carlos Daccarett, who had signed the Agreement in 2007 on behalf of Casaval. In 2007, Ivan held the position of Casaval's Regional Commercial Manager. He testified that he had reviewed the Agreement before his father had signed it. Ivan stated that Casaval had not received the Bray Sales Policy from Bray before his father signed the Agreement. He stated that "[t]he Agreement that was signed between Casaval and Bray only contained two pages." More specifically, Ivan testified that, before his father signed the Agreement,

they had received only two pages—the first page of the Agreement and the second page, Attachment A. He testified that Casaval had "logically understood" Attachment A to be the attached sales policy referenced in the first page of the Agreement. Ivan stated that Casaval had received a copy of the Bray Sales Policy only after Bray had filed the instant suit, during the discovery process.

Bray responded to Casaval's special appearance. Relevant to the issue of consent to personal jurisdiction, Bray offered Padilla's declaration. Casaval objected to portions of Padilla's declaration, and the trial court sustained some of the objections. But, in the portions of his declaration to which objections were not sustained, Padilla stated that, in 2007, he was responsible "for the negotiation and execution of an agreement between Bray and Casaval for the distribution and sale of [Bray's] products to Casaval." He also averred that, "[a]s part of the negotiations with Casaval, I communicated to Casaval (by discussions with Carlos Daccarett G. and others acting on behalf of Casaval) that any distributor agreement between Bray and Casaval had to include and be subject to the terms of Bray's standard sales policy." Like Ivan Daccarett, Padilla stated that he had delivered Attachment A along with the front-page Sales Agreement Document to Casaval. However, contrary to Ivan Daccarett's affidavit testimony, Padilla testified that he had "delivered a copy of the Bray Sales Policy that was in effect at such time in conjunction with delivery of a copy of the Agreement to Mr. Carlos Daccarett G. for signature."

9

As part of its reply to Bray's special appearance response, Casaval offered Padilla's deposition. In the deposition, Padilla testified that he provided the front page, Attachment A, and the Bray Sales Policy to Casaval in a cardboard folder. When asked how it was held together, Padilla stated, "By their clips . . . It was separate documentations with binder clips in a folder."

In its sur-reply, Bray objected to portions of Ivan Daccarett's affidavit. Specifically, Bray objected that Ivan's testimony that the agreement signed by his father was only two pages was conclusory. Bray also objected to Ivan's testimony that, at the time the Agreement was signed in 2007, Casaval had not received the Bray Sales Policy. Bray objected to that portion of Ivan's testimony on the basis that it lacked an evidentiary foundation and on the ground that Ivan lacked personal knowledge of the facts to support the testimony.

The trial court conducted a hearing on Casaval's special appearance via Zoom. The day before the hearing, Casaval filed a "bench brief" objecting that the parol evidence rule barred Bray from relying on extrinsic evidence. Casaval asserted that the Agreement was comprised of the front page "Sales Agreement Document" (which is also the signature page) and the single-page "Attachment A." Casaval claimed that those two pages "create a full and complete agreement that requires no reference to any extraneous document." Casaval asserted that Bray could not

10

introduce evidence outside of the two pages, including testimony regarding the Agreement's formation or the Bray Sales Policy.

At the hearing, Casaval called its current president, Ximena Delgado, to testify. She testified that, after the suit was filed, Casaval searched its records for the Bray Sales Policy but could not find it. Otherwise, Delgado's testimony pertained primarily to Casaval's meeting with Bray in Houston in May 2019 and to matters relating to Casaval's performance and its alleged repudiation of the Agreement.

Carlos Daccarett also testified at the hearing. Although Casaval had offered the affidavit testimony of Carlos's son, Ivan, in support of its special appearance, Casaval had not previously offered Carlos's testimony before the hearing.

Carlos testified that, at the time he signed the Agreement in 2007, he was Casaval's president. He stated that Bray had prepared the Agreement. He confirmed that he had negotiated the Agreement with Bray's representative, Javier Padilla. Carlos testified that, at the time he signed the Agreement, he was shown only two pages—the first page, which he signed, and the second page, which was Attachment A. Carlos confirmed that Padilla had given him Attachment A. When asked what he thought Attachment A was, Carlos answered "the sales agreement." Carlos testified that he had not been provided the 18-page Bray Sales Policy before he signed the Agreement. Carlos said that Padilla was not being truthful when he testified that he had given Carlos the Bray Sales Policy.

11

Bray called Padilla to testify at the hearing. Padilla testified that, before the Agreement was signed, he met with Carlos Daccarett twice at Casaval's offices in Columbia. During the first meeting, Padilla did not show Carlos the Bray Sales Policy but did explain the policies to him. Carlos was agreeable to Casaval signing an agreement with Bray and being subject to the sales policies. He stated that, after the first meeting, he prepared Attachment A. Padilla testified that at the second meeting, he gave Casaval a folder containing the Agreement. This included the front-page Sales Agreement Document, Attachment A, and the 18-page Bray Sales Policy. He stated that he gave the documents to Casaval "physically in a folder."

At the hearing, Padilla said that he discussed with Carlos the contents of the folder, including the Bray Sales Policy. Carlos did not sign the Agreement at the meeting. He told Padilla that he wanted to review the contents of the folder before he signed. The parties do not dispute that Carlos signed the front page and returned only that page to Bray without either Attachment A or the Bray Sales Policy.

After the hearing, the trial court signed an order denying Casaval's special appearance. The trial also overruled Casaval's objections based on the parol evidence rule but sustained Bray's objections to Ivan Daccarett's affidavit.

The trial court issued findings of fact and conclusions of law in support of its denial of Casaval's special appearance. The trial court concluded that it had specific jurisdiction over Casaval based on its contacts with Texas. The court also concluded

12

that Casaval had contractually consented to personal jurisdiction in the state. Regarding consent, the trial court found that the Agreement was comprised of the front-page Sales Agreement Document, Attachment A, and the 18-page Bray Sales Policy document. The court concluded that the language in the Bray Sales Policy providing that, "in the event of a dispute concerning this agreement, the parties agree that venue lies in a court of competent jurisdiction in Harris County, Texas," constituted a valid forum-selection clause that waived personal jurisdiction in the forum and that the Bray Sales Policy was part of the Agreement signed by Casaval.

Casaval now appeals. Raising three issues, Casaval contends the trial court made "substantive errors" in denying its special appearance and complains of the trial court's ruling sustaining Bray's objections to Ivan's affidavit.

## Denial of Special Appearance

In its first two issues, Casaval challenges the trial court's denial of its special appearance.

## A. Standard of Review

As a question of law, we review de novo whether a trial court has personal jurisdiction over a nonresident defendant. *See Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1, 8 (Tex. 2021). Resolving this question of law, though, may require a court to decide questions of fact. *Id.* If, as in this case, the trial court issues findings of fact and conclusions of law, the appellant may challenge the fact findings

13

on legal and factual sufficiency grounds, and we review the fact findings for both legal and factual sufficiency. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

## B.    Consent to Personal Jurisdiction

In its first issue, Casaval challenges the trial court's conclusion that Casaval contractually consented to personal jurisdiction by way of the forum-selection clause contained in the Bray Sales Policy. Casaval asserts that the Bray Sales Policy was not part of the Agreement. It also claims that, even if the forum-selection clause was part of the Agreement, the clause is not enforceable.

### 1.    *Legal Principles*

Typically, review of a ruling on a special appearance requires an analysis of whether a defendant has purposefully established minimum contacts with Texas, giving rise to either specific or general jurisdiction over the defendant, and whether the assertion of jurisdiction comports with fair play and substantial justice. *Guam Indus. Servs., Inc. v. Dresser-Rand Co.*, 514 S.W.3d 828, 833 (Tex. App.—Houston [1st Dist.] 2017, no pet.). But, as the Supreme Court of Texas has recognized, "a contractual 'consent-to-jurisdiction clause' subjects a party to personal jurisdiction, making an analysis of that party's contacts with the forum for personal jurisdiction purposes unnecessary." *In re Fisher*, 433 S.W.3d 523, 532 (Tex. 2014) (citing, inter alia, *RSR Corp. v. Siegmund*, 309 S.W.3d 686, 704 (Tex. App.—Dallas 2010, no

pet.)). This Court has also recognized that, "[i]f a party signs a contract with a forum-selection clause, then that party has either consented to personal jurisdiction or waived the requirements for personal jurisdiction in that forum." *Tri–State Bldg. Specialties, Inc. v. NCI Bldg. Sys., L.P.*, 184 S.W.3d 242, 248 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

### 2. *The Bray Sales Policy was Part of the Agreement*

The Agreement's front page stated that the Agreement was "subject to all terms and conditions of the attached Bray Sales Policy." In its conclusions of law, the trial court determined that the 18-page Bray Sales Policy was the document "attached to" the Agreement. The trial court rejected Casaval's argument that Attachment A was the referenced "attached Bray Sales Policy." The trial court concluded that "[t]he Agreement incorporated and was subject to the terms and conditions of the [18-page] Bray Sales Policy" and that the Bray Sales Policy "was part of the Agreement." The trial court then concluded that the Bray Sales Policy's language—providing that venue for a dispute concerning the Agreement lies in Harris County, Texas—was a valid forum-selection clause. Finally, the trial court concluded that by signing the Agreement—which contained the forum-selection clause—"Casaval consented to and waived any objection to personal jurisdiction in Texas."

On appeal, Casaval does not dispute that "[d]ocuments incorporated into a contract by reference become part of that contract." *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010) (orig. proceeding); *see Owen v. Hendricks*, 433 S.W.2d 164, 167 (Tex. 1968) (recognizing that unsigned documents may be incorporated into parties' contract by referencing unsigned document in signed agreement). Instead, Casaval asserts that the trial court erred in concluding that the 18-page Bray Sales Policy was part of the Agreement. Casaval claims that the front page's reference to "Bray Sales Policy," in the phrase "subject to all terms and conditions of the attached Bray Sales Policy," references Attachment A, not the 18-page Bray Sales Policy document.

A point of disagreement between the parties during the special-appearance proceedings was whether Bray provided the 18-page Bray Sales Policy to Casaval before Carlos Daccarett signed the Agreement. Carlos testified that Casaval had not received the Bray Sales Policy before he signed. He stated that Casaval had received only two pages: the front-page Sales Agreement Document and Attachment A.

In contrast, Padilla testified in his declaration and at the special-appearance hearing that he provided all three documents—the front-page Sales Agreement Document, Attachment A, and the Bray Sales Policy—to Carlos before he signed the Agreement. At the hearing, Padilla testified that, when he went to Casaval's offices for the second meeting with Carlos, the three documents were together in a folder. He stated that he "physically" gave the folder to Casaval. Similarly, in his

16

deposition, Padilla had testified that he had provided the documents in a cardboard folder. When asked how it was held together, Padilla stated, "By their clips . . . It was separate documentations with binder clips in a folder."

In a special appearance, the trial court is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Guam*, 514 S.W.3d at 832 (citing *Leesboro Corp. v. Hendrickson*, 322 S.W.3d 922, 926 (Tex. App.—Austin 2010, no pet.)). "We do not 'disturb a trial court's resolution of conflicting evidence that turns on the credibility or weight of the evidence.'" *Id.* (quoting *Ennis v. Loiseau*, 164 S.W.3d 698, 706 (Tex. App.—Austin 2005, no pet.)). Here, the trial court found that the contractual offer made by Bray to Casaval was comprised of (1) the front-page Sales Agreement Document (already signed by Padilla), (2) Attachment A, and (3) the 18-page Bray Sales Policy document. Thus, the trial court's findings of fact indicate that the trial court resolved the conflicting evidence and chose to believe Padilla's testimony. And we defer to that resolution.

The trial court also found that Carlos accepted the offer on behalf Casaval by signing the Agreement, thereby assenting to the terms of the offer. The trial court determined that the resulting Agreement was comprised of (1) the front-page Sales Agreement Document, (2) Attachment A, and (3) the Bray Sales Policy document. Whether the trial court properly determined that the 18-page Bray Sales Policy was part of the Agreement turns on whether the trial court properly determined that

17

document—and not Attachment A—was "the attached Bray Sales Policy" referred to in the first page of the Agreement.

Interpretation of a contract involves questions of law that we consider de novo. *BlueStone Nat. Res. II, LLC v. Randle*, 620 S.W.3d 380, 387 (Tex. 2021). As with any other contract, our primary objective in construing the Agreement is to give effect to the written expression of the parties' intent. *See Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 888 (Tex. 2019). In doing so, we interpret the Agreement's language according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise. *See id.* And we must consider the entire writing in an effort to harmonize and give effect to all its provisions so that none will be rendered meaningless. *See id.* at 889. "An unambiguous contract—one whose meaning is certain and definite—will be enforced as written." *BlueStone Nat. Res. II*, 620 S.W.3d at 387.

When interpreting a contract, we are mindful that we may not rely on evidence of surrounding circumstances to make the contract's language say what it unambiguously does not say or to create an ambiguity. *See Pathfinder Oil & Gas*, 574 S.W.3d at 889. But we may consider objectively determinable facts and circumstances that contextualize the parties' transaction and inform the meaning of the language used so long as we do not use surrounding circumstances to alter or contradict an unambiguous contract's terms. *Murphy Expl. & Prod. Co.-USA v.*

18

*Adams*, 560 S.W.3d 105, 109 (Tex. 2018); *see URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 757–58 (Tex. 2018) ("Contract language is thus construed in its lexical environment, which may include objectively determinable facts and circumstances that contextualize the parties' transaction.").

Here, the trial court, as factfinder, resolved the conflicting testimony and found that the 18-page Bray Sales Policy was part of the contractual offer to Casaval along with Attachment A. Thus, we consider the front-page's requirement that the Agreement be "subject to all terms and conditions of the attached Bray Sales Policy" in the context of the documents comprising the offer.

Casaval contends that the Bray Sales Policy document cannot be "the attached Bray Sales Policy" referenced in the front page because it was unattached, and that Attachment A was the only "attachment." However, Padilla testified that he gave Casaval all three documents together in one folder, stating they were "separate documentations with binder clips in a folder." In other words, Attachment A and the Bray Sales Policy document were similarly attached to the front page referencing the Bray Sales Policy.

We are mindful that the title of an instrument, "like every other portion of a contract, may be looked to in determining its meaning." *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 121 (Tex. 2015) (quoting *E.H. Perry & Co. v. Langbehn*, 252 S.W. 472, 474 (Tex. 1923)). Casaval asserts that Attachment A was the

referenced attached document because it contains the word "attachment" in its heading. But a review of the titles on all three documents supports Bray's interpretation that the 18-page Bray Sales Policy document is "the attached Bray Sales Policy" referenced in the front page, not Attachment A.

As discussed above, the top portion of the first page of the Agreement shows:



CASAVAL, S.A.
Via 40 No. 71-299
BARRANQUILLA, COLOMBIA

ATTN: Mr. CARLOS A. DACCARETT G.

This document represents an agreement between Bray Controls USA, a division of Bray International, Inc. of Houston, Texas USA, referred to hereinafter as "Bray," and the party stated above as the Appointed Bray Distributor for Bray, subject to all terms and conditions of the attached Bray Sales Policy.

Attachment A has the following heading:



**ATTACHMENT A**

And the top of the 18-page Bray Sales Policy reflects as follows:

**Bray Sales Policy**
**Sales Bulletin No. 1000**
**Date: January 2005, Page 1 of 18**

"The language used to incorporate a document is not important provided the signed document plainly refers to the incorporated document." *Tribble & Stephens*

20

*Co. v. RGM Constructors, L.P.*, 154 S.W.3d 639, 663 (Tex. App.—Houston [14th Dist.] 2004, pet. denied). The front page of the Agreement plainly referred to the "Bray Sales Policy" as the incorporated document. As the Supreme Court of Texas has recognized, "[T]he purpose of giving a person or thing a name is to distinguish that person, or thing, or class from others." *E.H. Perry & Co.*, 252 S.W.3d at 475. Here, there was only one document entitled "Bray Sales Policy": the 18-page Bray Sales Policy that the trial court found was part of the offer submitted to Casaval. In contrast, Attachment A, like the first page of the Agreement, was labeled "Sales Agreement Document" and "Sales Bulletin No. 1007." Thus, it is not reasonable to interpret Attachment A as the Bray Sales Policy when the only other document offered, aside from the first page, was a document titled "Bray Sales Policy." *See id.* ("The reason for designating the document before us as a 'cotton freight engagement note' was no doubt to indicate its object, and distinguish it from other classes of maritime contracts.").

Both the front page of the Agreement and Attachment A are labeled "Sales Policy Document" and "Sales Bulletin No. 1007," indicating that the parties intended Attachment A and the front page of the Agreement to comprise the Sales Agreement. By stating that the Agreement was "subject to all terms and conditions of the attached Bray Sales Policy," the plain language of the Agreement indicates that the Bray Sales Policy is a document extraneous to the Agreement in need of

21

incorporation. Attachment A was not an extraneous document in need of incorporation because on its face it indicates it is part of the sales agreement. To interpret the attached Bray Sales Policy to mean Attachment A would be redundant, and we strive not to read language in a contract to be redundant or superfluous. *See Philadelphia Indem. Ins. Co. v. White*, 490 S.W.3d 468, 477 (Tex. 2016).

The trial court made findings of fact that support its determination that the 18-page Bray Sales Policy was the Bray Sales Policy referenced in the Agreement's front page. Specifically, the trial court found that "Attachment A contains additional terms and conditions that were specifically negotiated between the parties, that are specific to the parties, and that focused on the relationship of the parties." The trial court's finding has support in Attachment A's language, particularly considering its heading signaling that it is part of the Sales Agreement. Attachment A provides, "The basis for the distribution agreement between Bray Controls (Manufacturer) and Casaval (Distributor) are: [10 separately listed terms and conditions]." For instance, the sixth listed term required Casaval not to sell certain products of Bray's competitors. Thus, the provisions of Attachment A also shows that it was part of the negotiated Agreement between the parties. The only document extraneous to the two Sales Agreement Documents in need of incorporation into the Agreement was the 18-page Bray Sales Policy, which contains no terms and conditions specific to Casaval but instead contains information, such as warranty information for its

products, that would apply to any distributor that incorporated the Bray Sales Policy into its agreement.

The trial court also found: "Attachment A does not contain the general sales policies of Bray that would apply to other distributors of Bray, and Attachment A is not the 'Bray Sales Policy' referenced in B 000002 [the first page] of Exhibit 1." Casaval criticizes this finding, asserting that "the Agreement's plain language does not require or support this assumption of the necessity for a general policy, and is devoid of any reference to general sales policies at all." However, as discussed, the specific terms and conditions between Casaval and Bray were part of the Agreement. Thus, the trial court's characterization of the Bray Sales Policy as "general" in contrast to the specific terms of the Agreement is a reasonable interpretation.

In its brief, Casaval contends that the trial court improperly relied on extrinsic evidence to support this finding. Specifically, Casaval asserts that the trial court improperly relied on Padilla's statement in his declaration in which he stated that Attachment A does not contain any general sales policies of Bray and, thus, is not the Bray Sales Policy referred to on the front page of the Agreement. Moreover, in addition to being extrinsic evidence, Casaval asserts it would have been improper for the trial court to rely on this portion of Padilla's declaration because the trial court sustained Casaval's objection to this part of Padilla's declaration. However, there is no indication that trial court relied on Padilla's declaration in making its

23

finding. As discussed, the trial court could have reasonably characterized the Bray Sales Policy as being general in contrast to the specific terms found in Attachment A.

In addition, the trial court found that "[s]ections 1 and 10 of Attachment A state that the distribution of products will be subject to the distribution or sales policies of Bray, indicating that Attachment A is not those sale policies and/or the Bray Sales Policy." Sections 1 and 10 of Attachment A read as follows:

> 1. Object: Casaval S.A.[] will distribute and commercialize in the Colombian territory the products manufactured by Bray Controls[] under the agreed distribution policies.
>
> . . . .
>
> 10. Prices or discounts for products and per Bray's policies may vary throughout this agreement.

Casaval criticizes the trial court's finding, asserting that "[n]othing about these sections [1 and 10] requires an extrinsic search for additional information. The more faithful reading of the Agreement, including Attachment A's plain language, is to consider Attachment A self-referential. . . ." We disagree with Casaval. In particular, section 10 refers to "Bray's policies," indicating a reference to the company's policies, like those found in the Bray Sales Policy document. "Bray's policies" would not reasonably indicate a reference to the specific terms and conditions governing the relationship between Casaval and Bray found in Attachment A. Thus, Attachment A's language supports the trial court's finding.

24

We hold that the record contains sufficient evidence to support the trial court's determination that the 18-page Bray Sales Policy was incorporated into and part of the Agreement. We next turn to Casaval's argument that, even if the Bray Sales Policy was part of the Agreement, the forum-selection clause contained in the Bray Sales Policy was unenforceable.

### 3. *Enforceability of Forum-selection Clause*

The court concluded that the language in the Bray Sales Policy providing that, "in the event of a dispute concerning this agreement, the parties agree that venue lies in a court of competent jurisdiction in Harris County, Texas," constituted a valid forum-selection clause and that, by signing the Agreement incorporating the Bray Sales Policy, Casaval had consented to and waived personal jurisdiction in Texas. On appeal, Casaval challenges the enforceability of the clause.

Casaval first asserts that Bray's defamation claim does not fall within the scope of the clause. To determine whether claims fall within the scope of a forum-selection clause, the Supreme Court of Texas has held that "a reviewing court should engage in a 'common-sense examination of the claims and the forum-selection clause to determine if the clause covers the claims.'" *In re Lisa Laser USA, Inc.*, 310 S.W.3d 880, 884 (Tex. 2010) (quoting *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 677 (Tex. 2009) (orig. proceeding)). We look at the factual allegations underlying the claims when deciding whether the claims are encompassed by the

25

forum-selection clause. *See Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W.3d 428, 433 (Tex. 2017). This analysis requires a common-sense examination of the claims' substance, rather than their label. *Id.* at 437. "Legal theories and causes of action are not controlling." *Id.*

The starting point of our inquiry is the forum-selection clause's language. *Id.* at 433. Here, the clause provides that "in the event of a dispute concerning this agreement, the parties agree that venue lies in a court of competent jurisdiction in Harris County, Texas."

Courts have considered the word "concerning" when used in forum-selection clauses to be "extremely broad" and synonymous with "relating to." *MPVF Lexington Partners, LLC v. W/P/V/C, LLC*, 148 F.Supp. 3d 1169, 1178 (D. Colo. 2015) (citing *Huffington v. T.C. Grp., LLC*, 637 F.3d 18, 22 (1st Cir. 2011) (explaining that phrases such as "relating to" are "broader than the concept of a causal connection, and to mean simply connected by reason of an established or discoverable relation")); *Schering Corp. v. First Databank, Inc.*, 479 F.Supp. 2d 468, 470–71 (D. N.J. 2007) ("A clause governing claims 'related to' or 'concerning' the parties' agreement applies to a broader range of claims than a clause governing claims 'arising under' the agreement.");[1] *see also Concerning*, MERRIAM-WEBSTER

---

[1]    "[W]e we look to federal law for guidance in analyzing forum-selection clauses." *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 677 (Tex. 2009) (orig. proceeding).

26

ONLINE DICTIONARY, www.merriam-webster.com/dictionary/concerning (last visited May 9, 2022) (defining "concerning" to mean "relating to: regarding").

The phrase "relates to" is recognized as "very broad" in scope. *O'Banion v. Inland W. Clear Lake Gulf Shores GP, LLC*, No. 01-15-00704-CV, 2017 WL 5494695, at *10 (Tex. App.—Houston [1st Dist.] Nov. 16, 2017, no pet.) (mem. op.) (quoting *SSR Corp.*, 309 S.W.3d at 701). "A claim relates to a contract if it has a significant relationship with or touches matters covered by the contract." *Gray v. Ward*, No. 05-18-00266-CV, 2019 WL 3759466, at *4 (Tex. App.—Dallas Aug. 9, 2019, no pet.) (mem. op.). Further, the scope of a clause that includes all "disputes," and not just claims, is very broad and encompasses more than claims "based solely on rights originating exclusively from the contract." *Pinto Tech. Ventures*, 526 S.W.3d at 439.

Among the factual allegations in its amended petition, Bray alleged that Casaval justified its repudiation of the Agreement by accusing Bray of "bad management" both verbally at the Houston meeting and later in writing. And, beyond those factual allegations, all of Bray's allegations of Casaval's liability focus on the contractual relationship between Bray and Casaval. Bray's defamation claim, which followed all its factual allegations, including the allegations about Bray's "bad management," stated that Casaval's "conduct constitutes defamation." Thus, as pled, the allegations underlying Bray's defamation claim concern and relate to the

Agreement because they concern or relate to the contractual relationship between the parties under the Agreement. *See Hou-Scape, Inc. v. Lloyd*, 945 S.W.2d 202, 206 (Tex. App.—Houston [1st Dist.] 1997, no writ) (holding that defamation claim, based on allegations that defendant made false statement regarding plaintiff's performance of sub-contract, fell within scope of arbitration clause because they arose out of and were "integrally related to the parties' relation and the sub-contract's performance).[2]

Casaval contends that the defamation claim does not fall within the scope of the forum-selection clause because "[t]he duty not to defame is imposed by law and not addressed in the parties' Agreement." However, the question is not whether the duty not to defame was addressed by the Agreement. The question is whether the claim is a dispute concerning the Agreement. As mentioned, when a clause covers "disputes," and not just claims, it is very broad and encompasses more than claims "based solely on rights originating exclusively from the contract." *Pinto Tech. Ventures*, 526 S.W.3d at 439; *see SH Salon L.L.C. v. Midtown Mkt. Missouri City, TX, L.L.C.*, 632 S.W.3d 655, 658 (Tex. App.—Houston [14th Dist.] 2021, no pet.) (rejecting appellant's argument that forum-selection clause should not apply because

---

[2]     In resolving disputes involving forum-selection clauses, courts are not only guided by federal law, but also by drawing analogies to arbitration cases based on the recognition that clauses requiring arbitration are "a specialized kind of forum-selection clause." *Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W.3d 428, 437 (Tex. 2017) (quoting *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 519 (1974)).

it was "not seeking relief under the terms of the Lease" and explaining that appellant's "argument misses the mark, as the relevant inquiry is whether [appellant's] claims 'aris[e] out of or relat[e] to this Lease, or the parties' relationship arising out of the Lease.'"). For the reasons explained, we conclude that Bray's defamation claim was a dispute concerning the Agreement. Therefore, the trial court correctly determined that the forum-selection clause applied to the claim.

Casaval also asserts that the clause "is not a forum-selection clause at all." Casaval contends that, "[b]ecause [the clause] refers to the **county** where suit should be brought, it is a venue-selection clause." (Boldface in original.) By emphasizing "county," Casaval appears to take issue with labeling the clause as a forum-selection clause because it refers to Harris County rather than the State of Texas. However, in the context of discussing consent to personal jurisdiction, courts have referred to contractual-venue clauses—selecting a particular county as the location for suit to be filed—as forum-selection clauses.[3] *See Michiana Easy Livin' Country, Inc. v.*

---

[3] We note that, in the context of determining what constitutes a forum-selection clause when the dispute is whether the trial court properly denied a motion to dismiss based on a forum-selection clause, courts have recognized that "not all agreements can be neatly labeled as selecting either a forum or a venue. Some agreements select both." *In re OSG Ship Mgmt., Inc.*, 514 S.W.3d 331, 337 (Tex. App.—Houston [14th Dist.] 2016, orig. proceeding); *see In re Morice*, No. 01–11–00541–CV, 2011 WL 4101141, at *1 (Tex. App.—Houston [1st Dist.] Sept. 15, 2011, orig. proceeding) (mem. op.) ("While [the parties] did not expressly select the State of New York as the forum in which such actions shall be tried, we conclude that their selection of a New York county as the proper venue for suits arising from the lease necessarily implies their selection of the State of New York as the forum for any such suit.").

*Holten*, 168 S.W.3d 777, 792 (Tex. 2005) (referring to contractual clause stating that "if any dispute between [parties] is submitted to a court for resolution, such legal proceeding or suit shall take place in the county in which [Michiana's] principle [sic.] offices are located" as forum-selection clause); *Carlile Bancshares, Inc. v. Armstrong*, Nos. 02–14–00014–CV, 02–14–00018–CV, 2014 WL 3891658, *3, *6–7 (Tex. App.—Fort Worth Aug. 7, 2014, no pet.) (mem. op.) (holding that contractual-venue clauses (similar to one here)—providing that "venue for any cause of action" arising from agreements would "lie in" Tarrant County—were forum-selection clauses, which operated as consent to jurisdiction); *see also Pennsylvania House, Inc. v. Barrett*, 760 F.Supp. 439, 448 (M.D. Pa. 1991) (holding that venue clause stating that "venue will lie in Union County, Pennsylvania" functioned as implied consent to personal jurisdiction even though it mentioned only venue and not jurisdiction because "consent to venue would be meaningless if *in personam* jurisdiction was lacking") (citing *Northwestern Nat'l Ins. Co. v. Donovan*, 916 F.2d 372, 377 (7th Cir. 1990) ("There would be no point to a clause that placed venue in Milwaukee County . . . but left the defendants free to object that they were outside the court's jurisdiction.")). Thus, the trial court did not err when it characterized the clause as a forum-selection clause, which equated to a consent to jurisdiction. *See Bancshares*, 2014 WL 3891658, at *6–7.

Finally, Casaval asserts that the clause is "void and unenforceable" because, except as statutorily permitted, parties are not allowed to select a venue by contract. *See Hiles v. Arnie & Co., P.C.*, 402 S.W.3d 820, 828 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (recognizing "that venue-selection clauses are generally unenforceable in Texas unless the contract evinces a 'major transaction' as defined in the venue rules") (citing, inter alia, TEX. CIV. PRAC. & REM. CODE § 15.020(a) (providing that venue may be specified by written agreement in a "major transaction" in which "a person pays or receives, or is obligated to pay or entitled to receive, consideration with an aggregate stated value equal to or greater than $1 million")). However, as pointed out by Bray, Casaval did not raise this defense to the clause in the trial court. As a result, we agree with Bray that the argument is waived. *See* TEX. R. APP. P. 33.1(a)(1); *Henry v. Fin. Cas. & Sur. Inc.*, No. 01-13-00672-CV, 2014 WL 2767394, at *2 (Tex. App.—Houston [1st Dist.] June 17, 2014, no pet.) (mem. op.) (holding that appellant waived arguments that forum-selection clause was unenforceable because arguments were not raised in trial court) (citing *Abacan Tech. Servs. Ltd. v. Global Marine Int'l Servs. Corp.*, 994 S.W.2d 839, 844 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (holding party failed to preserve complaint that forum-selection clause was unreasonable as matter of law because party did not raise complaint in trial court)).

In its reply brief, Casaval contends that its argument assailing the forum-selection clause is not waived because the error falls within the fundamental-error doctrine, which provides an exception to error preservation. However, the Supreme Court of Texas has made clear that the fundamental-error doctrine applies only in two "rare instances" in which: (1) "the record shows the court lacked [subject-matter] jurisdiction" or (2) "the public interest is directly and adversely affected as that interest is declared in the statutes or the Constitution of Texas." *USAA Texas Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 511 (Tex. 2018) (quoting *In re L.D.C.*, 400 S.W.3d 572, 574 (Tex. 2013)). The court also explained, "Although we have not hesitated to apply the doctrine when the error is jurisdictional or adversely affects the public's (as opposed to the current parties') interests, we have repeatedly refused to apply the fundamental-error doctrine to other types of errors and have instead consistently restricted appellate review to properly preserved errors." *Id.* (footnotes omitted). The court further explained that, for this reason, it had "characterized the fundamental doctrine as a rarity and a discredited doctrine." *Id.* (internal quotation marks and citations omitted).

Casaval offers the following argument for why the fundamental error doctrine applies here: "The statutes of Texas, as an expression of the public interest, establish the rules for venue. Because Bray's venue-selection clause attempts to restrict venue to Harris County, it is adverse to the public interest expressed in the venue statutes."

32

However, the record does not indicate that Bray sought to use the clause to "restrict venue to Harris County"; rather, in the context of the special-appearance proceedings, it relied on the clause to show that Casaval consented to personal jurisdiction. And Casaval has not shown how the public's interest, as opposed to Casaval's interest, is affected by enforcing the clause to waive Casaval's personal jurisdiction in this case. We conclude that this is not one of the "rare instances" in which the fundamental-error doctrine applies. *See id.* at 511.

We hold that the clause in Bray Sales Policy providing that, "in the event of a dispute concerning this agreement, the parties agree that venue lies in a court of competent jurisdiction in Harris County, Texas," was an enforceable consent to jurisdiction clause. As discussed, the Bray Sales Policy was part of the Agreement signed by Casaval. Thus, the trial court did not err in concluding that Casaval had consented to jurisdiction in, and waived any objection to, personal jurisdiction in Texas.

We overrule Casaval's first issue. Because this issue supports the trial court's denial of Casaval's special appearance, we need not address Casaval second issue in which it contends that "[t]he trial erred in finding Texas could constitutionally exercise personal jurisdiction over [it.]" *See* TEX. R. APP. P. 47.1.

## Grant of Bray's Objections to Ivan's Affidavit

In its third issue, Casaval contends that the trial court abused its discretion in granting Bray's objections to two sections of Ivan Daccarett's affidavit. Specifically, the trial court granted Bray's objections to Ivan's testimony (1) that the Agreement signed by his father, Carlos, was only two pages and (2) that, at the time the Agreement was signed, Casaval had not received the Bray Sales Policy.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Fleming v. Wilson*, 610 S.W.3d 18, 21 (Tex. 2020). A trial court abuses its discretion when it acts arbitrarily or unreasonably or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). If error exists, the complaining party must show that the exclusion of evidence probably resulted in the rendition of an improper judgment. *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009); *see* TEX. R. APP. P. 44.1(a)(1). Exclusion is likely harmless if the evidence was cumulative or if the rest of the evidence was so one-sided that the error likely made no difference in the judgment. *Gunn v. McCoy*, 554 S.W.3d 645, 668 (Tex. 2018); *Berwick v. Wagner*, 509 S.W.3d 411, 421 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).

Here, Casaval has not demonstrated that, even if the trial court abused its discretion in granting Bray's objections to Ivan's affidavit, the error probably caused the rendition of an improper judgment. *See Cent. Expressway Sign Assocs.*, 302

S.W.3d at 870. The record shows that, at the special-appearance hearing, Carlos's testimony provided the same information that was provided by Ivan in the objected-to portions of his affidavit. Like Ivan, Carlos testified that the Agreement he signed was comprised of only the Agreement's front page and Attachment A, and he testified that the Bray Sales Policy was not provided to Casaval before he signed the Agreement. Because of the cumulative nature of Ivan's affidavit testimony, error, if any, in granting Bray's objections was not likely to have caused an improper judgment, and Casaval has not shown otherwise. *See* TEX. R. APP. P. 44.1(a)(1); *see also In re Commitment of Gipson*, 580 S.W.3d 476, 488 (Tex. App.—Austin 2019, no pet.) ("We conclude that the evidence here is cumulative as to the State's point that Gipson made 'inconsistent versions of events,' and therefore that it is unlikely to have caused the rendition of an improper judgment."); *Crescendo Invs., Inc. v. Brice*, 61 S.W.3d 465, 478 (Tex. App.—San Antonio 2001, pet. denied) (holding that because excluded evidence was cumulative, error, if any, was harmless).

We overrule Casaval's third issue.

## Conclusion

We affirm the trial court's order denying Casaval's special appearance.

                                        Richard Hightower
                                        Justice

Panel consists of Justices Hightower, Countiss, Guerra.